**Reyth E. STALLINGS, and Harold Stallings, Plaintiffs–Appellants,**

v.

**WASHINGTON UNIVERSITY, and Dr. William Strecker, Defendants–Respondents.**

**No. 56861.**

Missouri Court of Appeals,
Eastern District,
Division Three.

July 31, 1990.

Mary Coffey, St. Louis, for plaintiffs-appellants.

Peter Spataro, St. Louis, for defendants-respondents.

SATZ, Presiding Judge.

This is a medical malpractice action. Plaintiffs, Mrs. Reyth Stallings and Mr. Harold Stallings, are wife and husband. They allege bodily injury to Mrs. Stallings

and loss of consortium to Mr. Stallings as a result of malpractice allegedly occurring during prosthetic shoulder replacement surgery performed by Dr. William Strecker, an employee of Washington University, at Barnes Hospital. Defendants are Doctor Strecker and Washington University.

The jury returned a verdict in favor of both defendants. Plaintiffs appeal. We affirm.

Plaintiffs' arguments on appeal are based upon a juror's failure to disclose facts on voir dire and challenges to evidentiary rulings of the trial court. None of these arguments is persuasive.

### Juror Nondisclosure

The issue of nondisclosure of information by a venireperson on voir dire is a constant companion of the courts in Missouri. The principles used to lay this issue to rest in individual cases are now well established. *E.g. Williams v. Barnes Hospital*, 736 S.W.2d 33 (Mo. banc 1987).

We recognize two kinds of juror nondisclosure: intentional and unintentional.

■ Intentional nondisclosure occurs (1) where there exists no reasonable inability to comprehend the information elicited by the question asked, and (2) where it develops that the prospective juror actually remembers the experience or that the experience was of such significance that his purported forgetfulness is unreasonable. *Williams v. Barnes Hospital, supra* at 36 (Mo. banc 1987). Unintentional nondisclosure exists where the experience forgotten was insignificant or remote in time, or where the prospective juror reasonably misunderstands the question posed. *Id.*

■ The determination of whether a concealment is intentional or unintentional is left to discretion of the trial court and is reversible only on a showing of abuse of discretion. *Id.* Intentional nondisclosure of material information creates an inference of bias and prejudice and may become tantamount to a per se requirement of a new trial. *Id.* at 37. Unintentional nondisclosure mandates a new trial only if preju-

dice has occurred because the juror's presence on the jury did or may have influenced the verdict. *Id.* Prejudice is a question of fact for the trial court, reversible only for an abuse of discretion. *Id.*

■ In the present case, the voir dire of the prospective jurors was comprehensive and extensive. The venire panel was asked, individually and collectively, several hundred questions. The issue here is created by the failure of a juror, Mr. Ketcherside,[1] to disclose he was defendant in a personal injury action at the time he was questioned on voir dire.

During her initial inquiry on voir dire, plaintiffs' counsel asked a number of questions, none of which, however, asked the panel whether any of them had asserted or filed a claim, or had a claim asserted or filed against them. During his inquiry, defendants' counsel asked questions designed to determine whether any of them had been the moving party in asserting or filing a personal injury claim or in asserting or filing other types of claims. For example, he asked:

. . . . .

And I would like to know if any of you have ever ... hired an attorney; or perhaps maybe even done it yourself, where you have actually filed a lawsuit, filed a claim in a court of law, asking someone else to pay you money damages because you were injured. Anyone ever done anything similar to that, like Mrs. Stallings has done?

. . . . .

[H]as anyone ever filed a personal injury action similar to this? Let's take it a step further. Perhaps you haven't filed a lawsuit but you did have a personal injury. Perhaps, it was an auto accident or something similar where you never filed a suit, but you did either hire a lawyer or you tried to work it out yourself where you asked for some type of damages because you thought someone

---

1. We shall use "Ketcherside" for convenience, with no intention to be disrespectful.

else was at fault or hurt you. Anyone ever done that?

. . . . .

None of you have ever filed any legal causes other than auto accidents? I take it that none of you have ever been a plaintiff like Mrs. Stallings in a medical malpractice claim, where you have actually sued a doctor or a hospital, or some other type of health care provider.

. . . . .

Then, in the second half of her voir dire, plaintiffs' counsel continued this line of questioning by asking:

[Defense counsel] mentioned anybody that's (sic) filed claims, anybody that may have filed a lawsuit.

Ladies and Gentlemen, I would like you to really search your minds as to that question. If it even has been fifteen years ago, and was for $500, would you please bring it up and tell us about it now?

. . . . .

Search your minds. That kind of information can be found out in the court records.... So, I beseech you to please search your minds and tell us right now if anybody's ever had a claim, especially filed a lawsuit.

These questions of both counsel focus on discovering whether any of the prospective jurors had been the moving party in asserting or filing a claim, not whether any of them ever had a claim asserted or filed against them. Quite simply, Juror Ketcherside was not asked the latter question, and there was no need for him to answer a question not asked. Obviously, before the issue of nondisclosure can be created, it must be clear the venireperson would understand that the question asked required disclosure of the information not revealed.

Plaintiffs contend it is reasonable to conclude that Ketcherside knew he was being asked whether he had ever had a claim asserted or filed against him. This contention rests on two grounds. During voir dire, two venirepersons voluntarily disclosed claims asserted against themselves or family members in response to the ques-

tion of plaintiffs' counsel, and, during the post-trial hearing on plaintiffs' motion for a new trial, Ketcherside stated he understood the voir dire was seeking to determine whether any venireperson had been either "plaintiffs or defendants in claims."

Plaintiffs' first ground stands logic on its head, and, thus, fails to provide support for plaintiffs' contention. The fact that two venirepersons answered a question that was not asked cannot mean the question was asked, either expressly or implicitly. To the contrary, logic dictates these venirepersons misunderstood the question asked, and Ketcherside did not.

Plaintiffs' second ground also fails to provide any support. During the post-trial hearing, plaintiffs' counsel never asked Ketcherside whether he remembered the question asked by plaintiffs' counsel during voir dire and what that question meant to him. Rather, over defendants' objection, plaintiffs' counsel asked Ketcherside:

Do you understand ... that was the kind of information we were looking for? Whether you had been a plaintiff or a defendant in a claim?

To this, he did answer: "Correct."

But, this question posed at the post-trial hearing assumes the questions asked on voir dire were seeking to determine whether any venireperson was *either* a plaintiff *or* a defendant. The voir dire questions, however, do not support that assumption. The voir dire questions were solely directed to determine whether any venireperson was a moving party in asserting or filing a claim. The assumption made by plaintiffs' counsel about the voir dire in her question posed to Ketcherside during the post-trial hearing is a misleading mischaracterization, and Ketcherside's response to that mischaracterization deserves the diminished or lack of weight the trial court, apparently, accorded it.

At the post-trial hearing, Ketcherside also stated he did not mention the law suit pending against him at the time of voir dire because he "hadn't been served yet." Plaintiffs showed, however, that Ketcherside had in fact been served and counsel

had entered his appearance on behalf of Ketcherside in that suit prior to the time of the voir dire here. Plaintiffs use this inconsistency as another attack on Ketcherside's credibility.

This testimony, isolated and starkly stated, is taken out of context. Ketcherside was asked by plaintiffs' counsel at the hearing whether he had "a lawsuit pending against" him at that time. He answered:

Now. But at the time of the jury, it was against my ex-landlord, who it was. See, I was not involved at the time that I was a juror.

Then, when asked whether he remembered the date he was served with the petition filed on August 26, 1988, he answered:

I really can't remember the date, August 26th, August 27th.

He was, in fact, served some 6 days later on September 4, 1988.

At the hearing, the court noted Juror Ketcherside "was a defendant in a lawsuit and had been served at the time of the Voir Dire," but it also noted "[Ketcherside] expressed some confusion.... [H]e thought that the landlord was being sued but not him." Subsequently, the court must have accepted Ketcherside's explanations. In denying plaintiffs' motion for a new trial, the court implicitly found Ketcherside was neither a sophisticated liar nor a dissembler. Its denial and implicit finding are reasonable, considered in the light of the questions asked on voir dire. Since all those questions focused solely on a venireperson being a moving party in asserting or filing a claim, Ketcherside had no reason to respond to those questions, and, thus, it is not surprising he did not.

Plaintiffs also argue that if Ketcherside's nondisclosure was unintentional and reasonable, his presence on the jury "did or may have influenced the verdict" so as to prejudice plaintiffs. *Williams v. Barnes Hospital, supra,* 736 S.W.2d at 37. The burden of this showing, however, is on plaintiffs. *Id.* Plaintiffs simply state that the "undisclosed pending personal injury lawsuit" against Ketcherside "necessarily creates a situation which did or may have influenced the verdict to the prejudice of plaintiffs." This free leap is not justified by the facts.

The answer to this argument is simple. Ketcherside had no need to answer the questions asked; therefore, there was no "nondisclosure," intentional or unintentional.

### Evidentiary Rulings

■ Plaintiffs argue the trial court improperly admitted medical literature or reports as substantive evidence during the testimony of defendants' medical experts. A recitation of additional facts is necessary to understand this argument.

While playing tennis plaintiff Mrs. Stallings incurred a "four-part fracture" of the humeral head of her right humerus. The humerus is the bone of the upper arm, extending between the shoulder and elbow. The humeral head forms a joint with the shoulder blade or scapula. The head fits into a depression of the scapula, the glenoid cavity, to form the shoulder joint.

Defendant Dr. Strecker operated on Mrs. Stallings in June, 1984 and replaced her fractured humeral head with a prosthesis called the Neer Prosthesis. This prosthesis has a rounded head attached to a tail or spike, in some ways similar to a golf ball attached to a tee. After the operation, Mrs. Stallings still suffered pain and loss of arm function unacceptable to her. Some six months later, she consulted Dr. John Brem, who reoperated on her arm in January, 1985.

At trial, plaintiffs based their claim of Dr. Strecker's alleged negligence on the testimony of Dr. Brem and a consulted medical expert, Dr. Elias Sedlin. According to these doctors, Dr. Strecker placed the tail or spike of the prosthetic humeral head too far down into the center of the humerus. This effectively shortened the humerus which, in turn, prevented the prosthetic humeral head from properly reaching up into the shoulder socket. "If the [humeral head] is placed too low", Dr. Brem said, "that effect shortens the [deltoid] muscle ... and the muscle will be flabby ... and [will] not [have] enough

power to pull the arm back up." This, he said, will cause pain and "poor" arm function. Thus, he said, an improper separation between the humeral head and socket, a "subluxation", caused Mrs. Stallings' pain and a greater than normal loss of arm function, after Dr. Strecker's operation. The pain and atypical loss of arm function, he said, were not caused by "muscle atony". "Atony" apparently means the muscle loses the slight normal contraction which gives it firmness and makes it ready to act.

Defendants' medical experts, Dr. Melvin Post and Dr. Charles Rockwood, disagreed. They testified that Dr. Strecker properly positioned the prosthetic humeral head. The cause of Mrs. Stallings' pain and atypical loss of arm function, they said, was not the alleged improper positioning of the humeral head; rather, there were other, real causes.

Dr. Post had specialized in shoulder surgery for fifteen to twenty years. He was familiar with four-part fractures similar to Mrs. Stallings' fracture and had been doing Neer Prosthesis surgery since 1960.

As to the causes he perceived, Dr. Post testified that the fracture traumatized Mrs. Stallings arm muscles causing muscle atony. This muscle atony, Dr. Post said, caused the lowering or subluxation of her humerus after Dr. Strecker's operation. This subluxation, however, was not unusual and was not caused by an improper positioning of the prosthetic head. He disagreed with Dr. Brem that "the deltoid and rotater cuffs were shortened and scarred from improper placement of the prothesis." He also said Mrs. Stallings suffered from reflex sympathetic dystrophy (RSD), which contributed to her loss of bone, mineral and protein. This, in turn, caused bone resorption, which contributed to the cause of her pain and loss of arm function. In addition, from his reading of an x-ray taken by Dr. Brem, he concluded Mrs. Stallings' humerus had regained its proper positioning in January, 1985, just prior to Dr. Brem's operation.

Dr. Rockwood had been chairman of the department of Orthopedics for twenty-two years at a medical school. For the ten to fifteen years preceding the trial, his practice "had been almost exclusively limited to shoulder problems", and he had been treating patients with "four-part fractures" similar to Mrs. Stallings fracture for about twenty years. He also had published literature on shoulder fractures and shoulder surgery.

Dr. Rockwood basically agreed with Dr. Post's testimony. Dr. Rockwood said Mrs. Stallings' subluxation had disappeared by January 1985 and her pain and loss of arm function after Dr. Strecker's operation were caused by muscle atony, RSD and atrophy of the muscle.

As set out, the battle between the parties' experts was joined. According to plaintiffs' experts, Mrs. Stallings pain and loss of arm function were caused by Dr. Strecker's improper positioning of the prosthetic humeral head, not by muscle atony. To the contrary, defendants' experts said the pain and loss of arm function were caused by "muscle atony," muscle atrophy and RSD. The positioning of the humeral head by Dr. Strecker was proper. The causal issue, however, was not left there.

Having elicited from Dr. Post testimony that the subluxation after Dr. Strecker's operation was caused, in part, by "muscle atony", defendants' counsel asked Dr. Post:

Are there any recent studies that you are aware of, ..., that talks (sic) about atony?

Dr. Post answered: "Yes". Then, when defense counsel asked Dr. Post to "describe" those studies to the jury, plaintiffs' counsel objected to that testimony on the grounds that it called for hearsay testimony about "medical literature", appropriate for cross-examination but "not on direct examination" as substantive evidence. Defendants' counsel argued that he was seeking information that Dr. Post "has based on his training and experience", "knowledge to support some of the findings in this case that he's personally aware of." The trial court overruled the objection of plaintiffs' counsel.

Then, defendants' counsel rephrased his question and asked:

Q. Doctor, your personal experience and training, are you aware of any recent studies on muscle atony associated with injuries of this type?

A. Yes.

Q. And can you describe it for the jury?

In response, Doctor Post related the contents of a lecture delivered during a professional seminar he had attended, in which "a renown orthopedic surgeon" described "25 cases of muscle atony, one with axillary nerve injury, a four-part fracture." (See Appendix)

The same basic scenario took place during the direct examination of Dr. Rockwood. Defendants' counsel asked Dr. Rockwood about his "experience" with "patients with four-part fractures" following surgery. Plaintiffs' counsel objected as she did before, and, after an extensive bench conference, the court overruled the objection.

Defendants' counsel, then, rephrased his question:

Q. Doctor, based on your training and experience and your knowledge of four-part shoulder fractures, and your studies of four-part shoulder fractures, can you tell the jury what is an expected result of a patient once the surgery is completed.

Doctor Rockwood answered by relating the amount of arm function remaining after surgery from his personal experience, and, over the objection of plaintiffs' counsel, he also related the results stated in medical literature and in a seminar "just held two weeks" before trial. (See Appendix)

On appeal, as they did at trial, plaintiffs argue the admission of references to medical literature and reports is an improper use of hearsay as substantive evidence on direct examination. We disagree.

To determine the propriety of these questions and answers, we must take language as it is and trial attorneys and witnesses as they are in the heat of trial. We read the questions asked by defendants' counsel and answers given by the doctors just as the trial court understood them. These questions and answers are focused on the explanation of some of the information and knowledge upon which the doctors based their opinions; rather than asking for and eliciting the contents of medical literature to be used as independent substantive evidence. This does not end the matter, however.

In 1989, after the trial here, this type of testimony may have received statutory admissibility by the enactment of § 490.065, RSMo.1989 (Supp.) which permits an expert to base his opinion upon

facts and data ... perceived by or made known to him at or before the hearing [but the facts and data] must be of a type reasonably relied upon by experts in the field in forming opinions ... upon the subject and must be otherwise reasonably reliable.

Section 490.065.3

However, prior to 1989, decisional law permitted some expert witnesses to testify to the hearsay basis of their opinions.

In Missouri, prior to 1989, an expert witness generally was permitted to state the reasons for his opinion only if the opinion had a substantial basis in facts actually established at trial. *See Fahy v. Dresser Industries, Inc.*, 740 S.W.2d 635, 638 (Mo. banc 1987). When the reasons for the expert's opinion " '... are based in part on hearsay, as far as the witness is concerned, the accepted and proper way to present in evidence [the] opinion of [the] expert witness is to present competent evidence of those facts from some proper source, and then submit them to the expert witness in a hypothetical question along with other relevant matter.' " *Davies v. Carter Carburetor, Div. ACF Industries, Inc.*, 429 S.W.2d 738, 751 (Mo.1968).

Exclusion of expert opinion based on facts not in evidence may be necessitated by one or both of two distinct evidentiary rules: the hearsay rule and the rule requiring that witnesses possess firsthand knowledge of the matters to which they testified. The difference between the two rules is simply a matter of form. McCormick, *On Evidence,* (3rd Ed.), § 247 (1987). The es-

sential reason for excluding an expert's opinion based upon facts not in evidence is clear. There is no adequate way of testing the reliability of expert testimony based upon information supplied by sources not available for cross-examination.

However, our Supreme Court created a narrow exception which at times permitted real estate experts to testify to land value based upon inadmissible evidence, including sources of which the witness has no first-hand knowledge. The Court recognized that the soundest basis for expert opinion in a particular case may be prior learning in the field, including materials such as textbooks, lectures, and statistical studies developed by third parties. *State ex rel. Highway Commission v. Barron*, 400 S.W.2d 33, 38 (Mo.1966). The Court therefore concluded that "the hearsay and best evidence rules should not be applied to prevent an expert witness from giving the basis of his opinion." *Id.* Accordingly, we have held that as long as the information which an expert witness obtains from other sources serves "only as a background for his opinion and [is] not offered as independent substantive evidence of value, he should not be precluded from testifying." *Del–Mar Redevelopment Corp. v. Associated Garages, Inc.*, 726 S.W.2d 866, 871 (Mo.App.1987).

This exception has been extended by our District Appellate Courts to include the testimony of a ballistics expert, *State v. Greenshaw*, 553 S.W.2d 318, 326–27 (Mo. App.1977) and to an expert's opinion based upon surveys. *Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 54 (Mo.App.1984). The sensible reason given for this additional extension of the exception was:

> [T]o allow an expert to rely upon published or reported data is a matter of necessity and to rule otherwise would set impossible standards with regard to proof. *State v. Greenshaw, supra* at 327.

However, an expert witness "may not under the guise of giving the basis of his opinion lug into evidence that which otherwise is incompetent." *State v. Dockery*, 300 S.W.2d 444, 452 (Mo.1957). Admitted-

ly, expert testimony based on inadmissible evidence may suggest collateral considerations. *See Empire District Electric Co. v. Cox*, 588 S.W.2d 263, 268 (Mo.App.1979). Nonetheless, "... any disadvantage which might result from the use of such evidence is more than compensated by the advantage of the more enlightened basis for [the fact finder's] ultimate determination of value." *Id.*

Our practice of permitting experts to testify based on reports from third parties is consistent with Rule 703 of the Federal Rules of Evidence, which provides, "if [the facts upon which an expert bases his opinion or inference are] of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts ... need not be admissible in evidence." The Advisory Committee's Notes explain that Rule 703 "is designed to broaden the basis for expert opinions ... and to bring the judicial practice into line with the practice of the experts themselves when not in court." The Committee observes that experts such as physicians routinely rely upon reports from third parties, even when making life-and-death decisions. Substantive evidence of information acquired from such sources is normally admissible in evidence, "but only with the expenditure of substantial time in producing and examining various authenticating witnesses." *Id.* The Committee concludes that the expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." *Id.* Thus, for the limited purpose of permitting an expert to explain the basis of his opinion, the federal rule permits "the substitution of the professional judgment of the expert as to the reliability of the basis facts as a substitute for the traditional process of producing a series of witnesses to establish them." McCormick, *supra*, § 324.2.

Moreover, several state jurisdictions have long permitted an expert witness "to *cite the writers* of his profession, either specifically by quotation, or generally by referring to professional opinion as corroborating his views." (emphasis theirs). 6

272

Wigmore § 1700(a) and cases cited therein. (Chadbourn rev. 1976)

However, a witness' expertise is an acceptable substitute for traditional authentication techniques only if the witness can, by virtue of his expertise, vouch for the reliability of the facts constituting the basis of his opinion. Therefore, as recognized in our present § 490.065.3 and stressed in the Advisory Committee's Notes to Federal Rule 703, "[i]f it be feared that enlargement of permissible data may tend to break down the rules of exclusion unduly, notice should be taken that the rule requires that the facts or data 'be of a type reasonably relied upon by experts in a particular field.'" Although, prior to 1989, our courts did not expressly restrict admission of basis evidence for an expert's opinion to the sort of data on which experts in the particular field customarily rely, that is the only sort of basis evidence which was allowed. *E.g. Barron, supra,* 400 S.W.2d 33 (expert may base land value opinion on comparable sales of which he has no first-hand knowledge); *Del–Mar Redevelopment Corp., supra,* 726 S.W.2d 866 (expert could base land value opinion on newsletter-survey which expert had not prepared).

We find the trial court's rulings properly applied the exception to the facts here, without the need for express statutory permission for that application made effective in 1989 by § 490.065.

■ Plaintiffs' next attack on an evidentiary ruling of the trial court is rooted in the pre-trial discovery engaged in here. Trial started in the present case in February, 1989. In May, 1988, plaintiffs deposed defendants' medical experts, Dr. Post and Dr. Rockwood. The pre- and post-operative x-rays of Mrs. Stallings taken by Dr. Brem were in existence at the time of the doctors' depositions. Plaintiffs, however, did not furnish these x-rays to either Dr. Post or Dr. Rockwood prior to or at their respective depositions. Plaintiffs, however, did provide the doctors with Dr. Brems' written notes.

At Dr. Post's deposition, plaintiffs' counsel asked him whether he had "any criticism of the care provided by Dr. Brem …?" He answered:

A. I'm here to discuss this case. I am not here to discuss Dr. Brems' care.

Q. You don't intend to express any opinions about Dr. Brems's care?

A. No.

Then, when asked by plaintiffs' counsel "[w]hat did [Dr. Brem] find when he went back in there [to reoperate]", Dr. Post referred to Dr. Brems' notes and said:

A. It's unfortunate. You don't have the later films here, do you?

Q. I didn't bring them.

When Dr. Rockwood was asked at his deposition by plaintiffs' counsel about Dr. Brems' surgery, he answered:

A. I don't know anything about Dr. Brems' surgery. I have not seen any x-rays. I don't know what's happened.

At trial, during defendants' case, defense counsel asked both Dr. Post and Dr. Rockwood for their opinions of the cause of plaintiffs' pain and loss of arm function based upon Dr. Brems' pre- and post-operative x-rays. The doctors were permitted to testify over plaintiffs' objections.

On appeal, plaintiffs contend, as they did at trial, that defendants had a continuing duty to supplement their medical experts' answers to deposition questions regarding their opinions and the basis for these opinions. More specifically, plaintiffs argue, defendants had the duty to disclose prior to trial that Dr. Post and Dr. Rockwood would be giving opinions based upon Dr. Brems' x-rays. On this record, we disagree.

Rule 56.01(e)(1)(B) requires a party, who has responded to written interrogatories, to supplement his response to any question directed to the general subject matter on which an expert is expected to testify. This rule embodies decisional law first generally stated in *Laws v. Wellston,* 435 S.W.2d 370, 375 (Mo.1968)[2]

2. "[W]here the after acquired information is of a material nature or where it will render the answers [to] interrogatories originally given untruthful, unreliable, or inaccurate, the obligation to disclose such after acquired information continues." *Id.* at 375.

In dicta, our colleagues in the Western District extended the continuing duty of Rule 56.01(e)(1)(B) to deposition questions and answers. *Gassen v. Woy*, 785 S.W.2d 601 (Mo.App.1990). *In Woy*, the Court found that, as a "component of the discovery process," there is an implied duty to supplement deposition answers which later cease to be correct. *Id.* at 603.

At some point "[i]n the progress of the trial" in *Woy*, plaintiff's attorney "discovered" that the defendant's medical expert would be asked to give his opinion about a set of x-rays. *Id.* at 602. At plaintiff's pre-trial deposition of defendant's expert, however, the expert had stated he had not seen the x-rays. Then, at trial, plaintiff objected to the expert giving his opinion about the x-rays because plaintiff had not deposed him on that subject. The objection was overruled. On appeal, the Court stated:

> [W]hen an expert witness has been deposed and he later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert to disclose that new information to his witness ... *Id.* at 604.

We need not address here the propriety of extending the continuing duty of supplementing answers to deposition questions. Although similiar to *Woy*, the present case differs on several essential facts.

Under *Woy*, the duty to inform an adversary of an expert's change of opinion or of the change of the basis of his opinion is triggered when the expert's opinion or its basis has in fact changed. However, in *Woy*, the Court's language apparently limits this trigger to those changes made before trial.

In the present case, defense counsel showed Dr. Brems' x-rays to his medical experts for the first time at trial, apparently, just before they testified. This was the third day of trial, after plaintiffs had rested. Defendants could not have informed plaintiffs of any change in the opinions or of a change of the basis for the opinions until defendants showed the x-rays to their experts at trial and the experts formed opinions based on the x-rays.

Arguably the duty to supplement would be triggered when defense counsel decided to elicit the doctors' opinions. *Woy*, 785 S.W.2d at 604. However, this would still require a showing that defense counsel did, in fact, consult or interview his medical experts about the x-rays after their deposition testimony. Otherwise, defense counsel would be required to inform plaintiffs' counsel of the questions he might ask, not of actual changes in the experts' opinions or in the changes of the basis for their opinions. This duty would be inconsistent with the duty to supplement interrogatory answers, which does not obligate a party to supplement an answer with speculative information. *Johnson v. National Super-Markets, Inc.*, 710 S.W.2d 455, 457 (Mo. App.1986).

More important, perhaps, in *Woy*, the trial court offered plaintiff's counsel the opportunity to interrogate defendant's expert during trial. Counsel rejected the offer. On appeal, the Court recognized that exclusion of evidence was not the only option of the trial court. Therefore, the Court held that the offer of an opportunity to interview defendant's expert, before he testified about nondisclosed facts, was a proper exercise of the trial courts' discretion. *Id.* at 604.

Here, plaintiffs made no express request for specific relief, and, therefore, their objection to the testimony of defendants' experts about Dr. Brems' x-rays carried with it the single implied request that this testimony be excluded. Faced with that single request, the trial court did not abuse its discretion in rejecting it.

Judgment affirmed.

SMITH and GRIMM, JJ., concur.

## APPENDIX

### Dr. Post—Direct Testimony

Q. Doctor, your personal experience and training, are you aware of any recent studies on muscle atony associated with injuries of this type?

A. Yes.

Q. And can you describe that for the jury?

A. On September 24, 1988, I was chairman of the Shoulder and Elbow meetings in Chicago for the American Academy. I had an invited guest ... a renown orthopedic surgeon ... [H]e was an invited guest to this country, and was a visiting professor in our department. And he delivered a lecture on 25 cases of muscle atony, one with axillary nerve injury, a four-part fracture.

[Plaintiffs' Counsel]: Your Honor, I object to the hearsay, him relating what this doctor said at this meeting....

The Court: Well, I'll permit it if it's something that Dr. Post has agreed were [sic] based upon his experience.

Q. Did the findings of this doctor agree with the things you found in your forum on muscle atony?

A. Yes, and that will be published in the Bone and Joint Journals, very shortly.

Q. And, ... in essence it found a relationship between two types of fractures and development of muscle atony?

A. Yes, which may be permanent sometimes.

APPENDIX

*Dr. Rockwood—Direct Testimony*

Q. Doctor, based on your training and experience and your knowledge of four-part shoulder fractures, and your studies of four-part shoulder fractures, can you tell the jury what is an expected result of a patient once the surgery is completed?

A. My own experience. I'm tickled to death if I can get ninety, ninety-five degrees of forward elevation. Meaning not so much out to the side. Can I bring my arm up in front of me, no. The horizontal position so that I can bend my elbow and get my hand up on top of my head.

As mentioned, I was involved in a course, and there is really now only four reported series, but of the three that are actually now in the literature—one is in the literature, range of motion is ninety-five degrees.

A. Now, the most recent article was at the meeting just held two weeks ago in Las Vegas, American Shoulder and Elbow Surgeons, by Dr. Hawkins from Canada.

[Plaintiffs' Counsel]: I apologize, I need to renew my objection and ask that it be continued as to this line of testimony. I'm sorry I interrupted you, sir.

The Court: Again I'm going to overrule it if is couched in the manner that we discussed earlier.

Q. Continue, Doctor.

A. Dr. Hawkins presented a series of patients and I had to bring it down, because I knew I was going to forget it. The average follow-up was forty months, almost four years. The average forward elevation was seventy-two degrees. As to the horizontal activity, the passive, they would only go up to a hundred and eleven degrees. That's just barely above the horizontal position. And all of those patients had excellent results. Six had good results, and six had poor results. So for my own patients, I tell them, "If you can get your arm to the horizontal position, I'm tickled to death."

Q. Doctor, does the information that you learned at that seminar confirm what you had seen in your own practice with four-part fractures?

A. Absolutely.