Amber BYERS, Plaintiff/Appellant,

v.

Christine CHENG, M.D., and The Washington University, Defendants/Respondents,

and

Emran Sheikh, M.D., Rodney E. Schmelzer, M.D., Dawn J. Geisler, M.D., and Barnes–Jewish Hospital, Defendants.

No. ED 88432.

Missouri Court of Appeals, Eastern District, Division One.

Oct. 30, 2007.

Application for Transfer Denied Dec. 18, 2007.

---

5. At time of trial, C.K. was eight and one half years old and S.K. was ten years old.

Robert H. Pedroli, Jr., Pedroli & Gauthier, Clayton, MO, for appellant.

Brian R. Plegge, Robyn Greifzu Fox, Catherine Vale Jochens, Moser & Marsalek, P.C., St. Louis, MO, for respondents.

KATHIANNE KNAUP CRANE, Presiding Judge.

Plaintiff filed a lawsuit to recover damages for medical malpractice alleged to have caused her to contract an infection after surgery to repair an open fracture to her forearm. The trial court entered judgment for defendants in accord with the jury verdict. On appeal, plaintiff asserts that the trial court erred in denying a new trial for two instances of juror nondisclosure, in excluding evidence, and in allowing defendants' expert witness to testify about the results of his published study. We affirm.

### FACTUAL and PROCEDURAL BACKGROUND

On July 5, 2003, plaintiff, Amber Byers, sustained an open fracture to her forearm after falling off a horse. A team of four surgeons thereafter operated on plaintiff at Barnes–Jewish Hospital to insert titanium surgical plates to hold and stabilize the fracture. Christine Cheng, M.D., was the attending surgeon and an employee of The Washington University. She was assisted

by Rodney Schmelzer, M.D., also an employee of The Washington University, and Emran Sheikh, M.D., and Dawn Geisler, M.D., both employees of Barnes–Jewish Hospital.

Plaintiff thereafter filed a lawsuit naming Dr. Cheng, The Washington University, Barnes–Jewish Hospital, Dr. Sheikh, Dr. Schmelzer, and Dr. Geisler as defendants. The petition alleged that the surgeons were negligent in failing to adequately clean and irrigate plaintiff's fracture site to remove contamination. The petition further alleged that as a direct result, plaintiff underwent multiple surgeries, therapies, · and treatments; lost wages and income; suffered permanent and progressive pain and crippling in her wrist and arm; and developed arthritis.

On the second day of trial, on plaintiff's motion, the trial court dismissed Barnes–Jewish Hospital, Dr. Sheikh, Dr. Schmelzer, and Dr. Geisler from the lawsuit without prejudice. The jury returned a verdict in favor of the remaining defendants, and the trial court entered judgment on the verdict. Plaintiff appeals.[1]

## DISCUSSION

### I. Juror Nondisclosure

■ For her first two points, plaintiff claims that the trial court erred in denying her motion for new trial because there were two instances of intentional nondisclosure by jurors during *voir dire*. The trial court denied the motion without making written findings. In this situation, we assume that the trial court made all findings necessary to the result. *Rogers v. Bond*, 880 S.W.2d 607, 610 (Mo.App.1994).

■ When a party claims it is entitled to a new trial because of intentional nondisclosure by a juror, the party must first establish that there was a nondisclosure. If a juror discloses everything that a *voir dire* question requires, no nondisclosure occurs. *Heinen v. Healthline Management, Inc.*, 982 S.W.2d 244, 248 (Mo. banc 1998). For example, if a juror does not know of a lawsuit at *voir dire*, the juror's silence when the panel was asked if anyone had been a party to a lawsuit is "complete disclosure." *Id.*

■ If a party has shown that there was a nondisclosure, then the trial court must decide if the nondisclosure was intentional or unintentional. A nondisclosure is intentional 1) when the juror has no reasonable inability to comprehend the information sought by the attorney's questions, and 2) when the juror actually remembers the experience or the experience was so significant that forgetfulness is unreasonable. *Williams ex rel. Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987); *Rogers*, 880 S.W.2d at 611. However, if the matter was insignificant or remote in time, or if the juror has reasonably misunderstood the question, a court may find the nondisclosure to be unintentional. *Williams*, 736 S.W.2d at 36; *Rogers*, 880 S.W.2d at 611. We review a trial court's determination of whether a nondisclosure is intentional or unintentional for abuse of discretion. *Rogers*, 880 S.W.2d at 610–11, citing *Williams*, 736 S.W.2d at 36.

■ Intentional nondisclosure creates an inference of bias and prejudice. *Stallings v. Washington University*, 794 S.W.2d 264, 266 (Mo.App.1990). However, if the nondisclosure was unintentional and reasonable, the party seeking a new trial

---

**1.** The legal file is in reverse chronological order, which violates Rule 81.12 and Eastern District Special Rule 330(b). *See Siegfried v.* *Remaklus*, 95 S.W.3d 107, 111 n. 1 (Mo.App. 2001).

must establish that the juror's presence did or may have influenced the verdict to its prejudice. *Heinen,* 982 S.W.2d at 250; *see also Williams,* 736 S.W.2d at 37; *Anglim v. Missouri Pacific R. Co.,* 832 S.W.2d 298, 306 (Mo. banc), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Rogers,* 880 S.W.2d at 611. To determine prejudice, we consider the materiality and relevance of the undisclosed incident to the matter being tried. *Rogers,* 880 S.W.2d at 611.

A. *Acquaintance with Plaintiff's Counsel*

■ Plaintiff first asserts that a juror, C.C., intentionally concealed "his familiarity" with plaintiff's counsel, Robert Pedroli, Jr. Plaintiff contends that C.C. understood the question and his failure to answer was unreasonable because he and Mr. Pedroli were related, C.C. was a good friend of Mr. Pedroli's father and uncles, C.C. worked for Mr. Pedroli's aunt for twenty years, and C.C. drove his mother to Mr. Pedroli's father wake.

During *voir dire,* Mr. Pedroli introduced himself and his firm. He then asked the following questions of the venire panel to determine if anyone knew him:

We practice through the entire metropolitan St. Louis area, and I'm wondering if there's anyone on the panel that knows me.

Is there anyone on the panel that knows me or my firm where we've represented someone in your family or anything like that?

Anyone else on the panel that knows me or my firm?

One venireperson responded to the first question, one venireperson responded to the second question, and no one responded to the third question.

In his motion for new trial, plaintiff alleged that C.C. intentionally did not disclose the fact "that he knew" Mr. Pedroli.

C.C. testified at the hearing on the motion. Mr. Pedroli elicited the following answers:

Q: Okay. And, who am I?

A: You're the lawyer for Amber Byers.

Q: Okay. And do you have any other familiarity with me?

A: No.

In response to further questions by Mr. Pedroli, C.C. testified that his mother's maiden name was Pedroli, and that he just then realized it was the same as Mr. Pedroli's last name; he knew Robert Pedroli and Ray Pedroli, who owned a gas station, but at *voir dire* he did not connect them with Mr. Pedroli; and he worked for Adele Ruggeri for twenty years. C.C. also testified that he recognized Mr. Pedroli's wife, who was in the courtroom for the hearing. Mr. Pedroli did not ask if C.C. knew during *voir dire* that Robert Pedroli, Sr. was Mr. Pedroli's father, that Ray Pedroli was his uncle, or that Adele Ruggeri was his aunt. Referring to the day of *voir dire,* Mr. Pedroli said in a question to C.C., ". . . I wish I would have realized who you were I would have—" C.C. responded, "[t]oday now I know who you are because that day I never would have known."

On cross-examination, defense counsel elicited the following:

Q: Do you ever recall seeing Mr. Pedroli in a situation where you can remember that it was him right now?

A: No, sir.

Q: Okay. Do you ever recall ever talking to Mr. Pedroli where you knew that it was Mr. Pedroli?

A: No, sir.

Q: Now, you've heard the—asked you some questions. Seems to me there

were discussions with his family that you have had but not—

A: Adele was my boss and we worked there together for twenty years. Kids never involved—her kids were—they worked at the restaurant.

Q: So, you don't ever recall seeing or talking to Mr. Pedroli ever in your life?

A: No, sir. I would have said something.

After hearing the testimony, the trial court reminded Mr. Pedroli that his question at *voir dire* was whether anyone knew him, "I don't think [C.C.] to this date knows you. He now knows who you are." The court also said, "I'd like to point out, sir, that this witness stated that he does not know you and you obviously did not know him." The trial court stated on the record that C.C. was "very honest" and a "very credible witness."

This is a situation in which there was no nondisclosure. We defer to the trial court's credibility finding and accept C.C.'s testimony that he did not know Mr. Pedroli at the time of *voir dire*. Because C.C. did not know Mr. Pedroli at the time of *voir dire*, his silence when Mr. Pedroli asked if any venireperson knew him was complete disclosure. *See Heinen*, 982 S.W.2d at 248; *see also Banks v. Village Enterprises, Inc.*, 32 S.W.3d 780, 787 (Mo. App. W.D.2000).

Accordingly, the trial court did not abuse its discretion in denying the motion for a new trial on the ground that C.C. failed to disclose he knew Mr. Pedroli. Point one is denied.

B. *Nondisclosure of Collection Suit*

 Plaintiff next contends that another juror, C.H., intentionally concealed the fact that he was a defendant in a lawsuit when counsel asked the venire panel if anyone had ever been a plaintiff or a defendant in a lawsuit. Plaintiff asserts that

C.H.'s "forgetfulness" was unreasonable because the lawsuit was filed and personally served within five years, C.H. was named as a defendant and appeared "at the docket," and C.H.'s wages were garnished for almost three years.

During *voir dire*, Mr. Pedroli directed the following question to the venire panel on the issue of whether anyone had been a plaintiff or defendant in a lawsuit:

The question is I'm going to ask if anyone's ever been a plaintiff or a defendant in a lawsuit. And when I say lawsuit, I do not include domestic family law cases involving custody, divorces, or personal relationships between spouses or boyfriends and girlfriends, things like that. Other than that, I'm including everything.

Fifteen venire persons responded, but C.H. did not respond.

In his motion for new trial, plaintiff alleged that C.H. intentionally failed to disclose that he was a defendant in a lawsuit brought by Sears, Roebuck and Company in October 2001. At the hearing on the motion, Mr. Pedroli asked C.H. if he had been "sued by Sears & Roebuck," and C.H. responded that he had not. Plaintiff produced the certified court file in a case filed by Sears, Roebuck and Company against C.H. The court file indicated that a petition on account was filed on October 25, 2001, and was personally served on C.H. on December 15, 2001. Judgment was entered against C.H. on January 9, 2002, for $3,248.75 and costs. C.H.'s wages were garnished to satisfy this judgment from February 2002 through November 2004. His bank account was also garnished.

Plaintiff's counsel told C.H. that C.H. had been "named as a defendant in a lawsuit against Sears & Roebuck [sic] that you were served with suit papers and that

a judgment and default was taken against you on January 9, 2002, and that that lawsuit was garnished against your wages for a couple years." C.H. responded that he recalled being served, but he had "paid them off." The questioning continued:

> Q: And, when you got those suit papers you don't show up in court like you were supposed to and they took a default judgment against you?
>
> A: I did come to court. I came to court downtown.
>
> Q: So, you appeared in court. Do you know why a default judgment was entered against you?
>
> A: No, I don't. They told me that I didn't have to show up so I left.

 \* \* \* \* \* \*

He agreed that Sears had collected from his employer and bank. Mr. Pedroli then questioned C.H. about his answers on *voir dire:*

> Q: And, do you remember when we questioned you and the question was asked whether—let me find it—"if anyone's been a plaintiff or defendant in a lawsuit and when I say lawsuit I do not mean a domestic family law case involving custody, divorces or personal relationship between spouses or boyfriend and girlfriend, things like that. Other than that I'm including everything." Do you remember generally me asking that question?
>
> A: Not really.
>
> Q: If you do recall that, if I did ask that question, would you have told us about the fact that you were sued by Sears?
>
> A: If I would have remembered I would have told you.
>
> Q: And you don't remember?
>
> A: No, I don't.

> Q: Even though you were garnished for two years, two and a half years, up until November of 2004?
>
> [Objection]
>
> A: I just answered that question. I told you if I would remember—if I remembered that I would have told you.
>
> Q: But you're saying the fact you were garnished over two and a half years that was something that didn't stick in your head?
>
> A: No, because I mean when you get money taken out of your check or whatever the case may be it's kind of like having health insurance taken out of your check. That's just something you don't trip off of that, you know, it's taken out.

On cross-examination by defendants' counsel, C.H. testified:

> Q: When Mr. Pedroli first asked you whether you remembered this lawsuit you said you didn't?
>
> A: Yes.
>
> Q: Same today; same as when you were in here when they were asking you questions you didn't remember this?
>
> A: I didn't remember.
>
> Q: You didn't even think it was a lawsuit, did you?
>
> A: I didn't think it was a lawsuit. I never had to come up here and testify so I'm thinking—
>
> Q: You thought you might have owed money to somebody; you paid the money; you didn't realize or think there was a lawsuit involved, is that right?
>
> A: Absolutely.

On redirect examination, C.H. explained his understanding of what constituted a lawsuit:

> [A]s far as like a lawsuit my understanding of a lawsuit is when you go to court and you sit in here—just like the

case with Miss Byers, you sit here with a jury. That's my understanding of a lawsuit, someone filing something against you.

. . . .

I'm not familiar with the lawsuit and how they go about doing things. A garnishment is a garnishment to me. I mean if that's a lawsuit then—I mean I haven't taken up any classes, you know, for being a lawyer so I wouldn't know.

After hearing the testimony, the court explained that C.H.'s concept of what constituted a lawsuit is common:

My experience with dealing with venire persons [is that] their concept of a lawsuit and our concept of a lawsuit are entirely different. [C.H.] said and many jurors will tell you they don't believe it's a lawsuit unless they have to come into court and testify. Outside of that they don't think it's a lawsuit. Their perception of a lawsuit is based on what they see on television, the Matlock syndrome. You come into the courtroom, you swear, you testify.

The trial court found C.H. to be "quite honest."

█ Again, we defer to the trial court's credibility findings and its determination that C.H.'s failure to equate the proceeding that led to the garnishment with a lawsuit was reasonable. Judgment was entered against C.H. less than a month after he was served, and, although C.H. went to the courthouse, he was sent home. A venireperson's misunderstanding that a

garnishment is not a lawsuit can be reasonable. *See, e.g., Bradford v. BJC Corporate Health Services.*, 200 S.W.3d 173, 182–83 (Mo.App.2006);[2] *Rogers,* 880 S.W.2d at 611. Moreover, in his questions to the panel, Mr. Pedroli did not attempt to explain, define, or give examples about what constituted a lawsuit. *See Rogers,* 880 S.W.2d at 611. In these circumstances, the trial court did not abuse its discretion in finding C.H.'s nondisclosure to be unintentional.

█ Because plaintiff did not establish that C.H.'s nondisclosure was intentional, she was required to establish prejudice in order to prevail on her motion for new trial. *Heinen,* 982 S.W.2d at 250. However, in her argument under this point, plaintiff only asks us to infer prejudice from C.H.'s "intentional nondisclosure." She does not argue any other basis for finding prejudice. As a result, she has abandoned any claim that she was prejudiced by C.H.'s unintentional nondisclosure.

The trial court did not abuse its discretion in denying plaintiff's motion for new trial on the ground that C.H. did not disclose he was a defendant in a collection suit. Point two is denied.

## II. *Exclusion of Evidence*

In her next two points, plaintiff challenges the trial court's exclusion of evidence of the presence of horse manure on the ground in the general area of the horse trail where plaintiff fell, and evidence that plaintiff's pathologist was incompetent.

---

**2.** *Bradford* distinguishes the two cases on which plaintiff relies—*Brines By and Through Harlan v. Cibis,* 882 S.W.2d 138 (Mo. banc 1994) and *Hatfield v. Griffin,* 147 S.W.3d 115 (Mo.App.2004). *Brines* involved a juror in a medical malpractice action who failed to disclose that he had been a defendant in eight different lawsuits, seven of which were collection suits by physicians. We found this rose

to the level of nondisclosure on a material issue warranting a new trial. *Brines,* 882 S.W.2d at 140. In *Hatfield,* the court remanded for a new trial after finding that a juror's nondisclosure of an action for nonpayment of medical expenses the week before trial was intentional. *Hatfield,* 147 S.W.3d at 120.

 The decision to admit or exclude evidence is within the sound discretion of the trial court because it is in a superior position to evaluate the proffered evidence in the context of the trial. *Romeo v. Jones*, 144 S.W.3d 324, 332 (Mo. App.2004). When a trial court has excluded evidence, we review for abuse of discretion, not whether the evidence was admissible. *Id.* To reverse, we must find the trial court's exclusion of evidence prejudiced the appellant by materially affecting the merits of the action. *Id.*

A. *Presence of Horse Manure*

 For her third point, plaintiff claims that the trial court erred in excluding evidence about the presence of horse manure present on the ground in the general area of the horse trail where plaintiff fell. Plaintiff concludes that this evidence was relevant to the issue of causation because Dr. Cheng testified that she would have treated plaintiff differently if she knew plaintiff had fallen on the ground where there was possible fecal matter, because knowledge of the possibility of fecal matter contamination "heightens the treatment approach" for plaintiff's injury, and the specific bacterial infection plaintiff suffered was both consistent with, and the direct result of, fecal bacteria. In the argument under this point, plaintiff only refers to the exclusion of the deposition testimony of paramedics at the scene of plaintiff's fall. Her error is accordingly limited to this contention.

Defendants filed a motion in limine to preclude all evidence of manure.[3] At a hearing on the motion, defendants argued that the court should bar any reference to or mention of the presence of horse manure in the wound because there was no evidence of horse manure in the wound or at the site of plaintiff's fall. Defendants further argued that any evidence of the presence of horse manure in other places on the horse trail was irrelevant and inflammatory. Plaintiff's counsel responded that he should be allowed to refer to the presence of manure on the horse trail, because an open fracture with contamination in an area where manure is present would be treated differently than a fracture where manure is not present due to the increased risk of gram-negative infection. The trial court sustained the motion.

During trial, plaintiff attempted to introduce portions of depositions of paramedics who came to the scene where they testified to the presence of horse manure. The court sustained defendants' objection, consistent with its ruling on the motion in limine. Plaintiff made an offer of proof by reading portions of the depositions of the two paramedics.[4] Both testified that they had seen horse manure on the trail but not in the area where plaintiff fell, and they did not see manure in the wound.

 In her argument under this point, plaintiff argues that this evidence was relevant. However, plaintiff cannot demonstrate error in the exclusion of evidence unless she also shows prejudice. *Romeo*, 144 S.W.3d at 332. Plaintiff has not argued prejudice, thus abandoning this issue.

We have gratuitously examined the record for prejudice and find none. There was evidence at trial that plaintiff fell on a horse trail, and plaintiff testified that she saw droppings on the trails. Plaintiff's expert, Dr. Ahn, testified that the bacteria in plaintiff's wound was consistent with "something you might find on a horse trail." Plaintiff also extensively cross-examined Dr. Cheng on the possibility of

---

3. The motion in limine appears on the docket sheet, but it not in the legal file.

4. A third deposition is not in the record on appeal.

fecal contamination in the wound and the resulting variations in the standard of care. In closing argument, plaintiff's counsel argued that fecal bacterial contamination from a horse trail ended up in plaintiff's wound. Thus, plaintiff did introduce evidence of horse manure on the trail from other sources and was fully able to present and argue her theories that the wound was contaminated by fecal matter in the dirt on a horse trail and that this situation had a bearing on the standard of care.

■ "[T]he exclusion of evidence that is merely additional evidence of the same kind bearing upon the same point will not be considered prejudicial error upon appeal." *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573, 590 (Mo. banc 1978); *Uxa ex rel. Uxa v. Marconi*, 128 S.W.3d 121, 132 (Mo.App.2003). The trial court did not abuse its discretion because the exclusion of the proffered evidence did not materially affect the merits of the action, and plaintiff was not prejudiced by its rejection. *See Whitworth v. Jones*, 41 S.W.3d 625, 627–29 (Mo.App.2001). Point three is denied.

### B. *Incompetence of Pathologist*

■ Plaintiff next contends that the trial court erred in excluding evidence that a pathologist, identified only as Dr. Skelly, was incompetent and misread pathology slides in other cases. Plaintiff argues that this evidence was relevant to show why Dr. Skelly's pathology report did not find grass and dirt in a sample of bone extracted from plaintiff's wound, and a subsequent pathologist did find plant material in the sample.

At trial, plaintiff called Joon S. Ahn, M.D., who treated and performed surgery on plaintiff after she was treated by Dr. Cheng. On direct examination, Dr. Ahn testified that he took a tissue sample from plaintiff's wound during her surgery on August 29, 2003, and sent it to the hospital's pathology department. The pathology report authored by Dr. Skelly found no grass or dirt. Dr. Ahn testified that after he was deposed in this case, he went back to the pathology department and learned that Dr. Skelly had been terminated from his position. Defendants' counsel objected. At a sidebar, plaintiff's counsel argued that he was laying a foundation for Dr. Skelly's incompetence. Defendants' counsel argued that this was an attempt to impeach a collateral witness on a collateral issue, there was no evidence that Dr. Skelly misread this particular slide, and any suggestion that Dr. Skelly was fired for incompetence with respect to other slides was highly prejudicial. The trial court sustained the objection.

Plaintiff made an offer of proof through Dr. Ahn, who testified outside the presence of the jury that Dr. Skelly was terminated by the hospital for peer review reasons. Dr. Ahn also testified that he had personal knowledge that Dr. Skelly had misread pathology slides and that other surgeons had similar problems. Dr. Ahn "felt" that Dr. Skelly's incompetence impacted his ability to read the slide in this case. The trial court sustained the objection.

On appeal, plaintiff argues that she was prejudiced because she was not allowed to explain the discrepancy between Dr. Skelly's pathology report and another pathology report that was obtained during litigation. However, plaintiff cites no relevant legal authority to support this argument. Her only authority is *Shoemaker v. Ekunno*, 960 S.W.2d 527 (Mo.App.1998), involving a claim of abuse of discretion in *admitting*, not *excluding*, evidence of the defendant's nurses' competency. We found no abuse of discretion because an issue at trial was whether defendant's

nurses had competently counted sponges. *Id.* at 531. Because *Shoemaker* did not involve a *reversal* based on a trial court's *exclusion* of evidence, it is not persuasive precedent on the question of reversal for abuse of discretion. In addition, in *Shoemaker*, the issue was the competency of the defendant's own employees. Here, plaintiff sought to challenge the competency of a pathologist who was not a party or a witness and who had been used by plaintiff's own witness, who was a non-party treating physician. *Shoemaker* is simply not on point.

The exclusion of the evidence of Dr. Skelly's reputation and termination did not materially affect the merits of this action. Whether or not a non-party, non-witness pathologist who examined a slide from plaintiff's subsequent non-party treating physician was or was not competent would not tend to prove or disprove whether Dr. Cheng was medically negligent in treating plaintiff.

The trial court did not abuse its discretion because the exclusion of the proffered evidence did not materially affect the merits of the action, and plaintiff was not prejudiced. *See Whitworth,* 41 S.W.3d at 627–29. Point four is denied.

### III. *Expert Testimony*

■ For her last point, plaintiff maintains that the trial court erred when it allowed defendants' expert, David Bozentka, M.D., to testify on direct examination about the "results in his published article on open fractures of the distal radius," because the article was not direct and independent evidence admissible on "direct examination" and plaintiff was prejudiced. She contends that this was the only evidence of the infection rate sustained by patients who had suffered open fractures of the distal radius.

On direct examination, Dr. Bozentka, an orthopedic surgeon, identified Exhibit H, a copy of an article that he co-authored on open fractures of the distal radius several years prior to trial, and that had been published in THE JOURNAL OF HAND SURGERY. Defendants' counsel subsequently referred to that article in a question to Dr. Bozentka, and plaintiff's counsel objected. Plaintiff's counsel conceded that the article was an authoritative text because it was subject to peer review, but argued that a party cannot question an expert with a learned treatise, even one authored by the expert, on direct examination, but can only use it for cross-examination of an expert. Defendants' counsel responded that an expert can testify to his own findings and studies and show how these form the basis of his opinion. The court overruled the objection, but treated it as a continuing objection. Defendants' counsel then asked:

Q: I'm going to ask you some questions about your opinion as to whether—as to what Amber's condition would have been had this wound not become infected, based upon your understanding of all the medical records in this case, about all of the testimony that you've read, and also based upon what you've found in your own research and how that serves as a basis for your opinions concerning what the infection rate would have been, what the complication rate would have been for Amber Byers in this case. Is that understood?

Dr. Bozentka then testified about the methodology and findings of his study on patients with open distal radius fractures, and the complications and infection rate for the patients in his study, before proceeding to his opinion. At the conclusion of Dr. Bozentka's testimony, defendants offered Exhibit H into evidence. Plaintiff did not object to the admission of Exhibit H as long as it would not go to the jury. The trial court received it with that condition.

Plaintiff's failure to object to the admission of the article when it was offered into evidence raises the question of whether his claim that the court erred in allowing Dr. Bozentka to testify about the article is preserved. However, even if the claim of error was preserved, it has no merit.

Plaintiff contends that Dr. Bozentka's testimony about the findings in his study was the use of "learned treatises" that constituted inadmissible hearsay during the direct examination of an expert witness. In support of this argument, plaintiff relies exclusively on cases holding that learned treatises constitute hearsay, and as such are inadmissible during direct examination of an expert witness as independent evidence of the facts asserted in the text, although they may be used on cross-examination to challenge an expert's credibility. *Herrera v. DiMayuga*, 904 S.W.2d 490, 493–94 (Mo.App.1995); *Powers v. Ellfeldt*, 768 S.W.2d 142, 148 (Mo.App.1989); *Kelly v. St. Luke's Hosp.*, 826 S.W.2d 391, 396 (Mo.App.1992). Plaintiff's argument ignores the fact that this rule is wholly dependent on a conclusion that the "learned treatise" in question is hearsay. The reason learned treatises are generally considered hearsay is because they constitute out-of-court statements made by a person who is not subject to cross-examination. 6 JOHN HENRY WIGMORE, EVIDENCE section 1690 (Chadbourn rev.1976). In this case, the author of the "learned treatise" was the testifying expert and was subject to cross-examination. Plaintiff cites no authority explaining why a "learned treatise" is hearsay when the testifying expert is the author of the study and is subject to cross-examination.

■ Even if the published study had been authored by someone else and was hearsay, Missouri common and statutory law would not have prohibited Dr. Bozentka from relying on it as background for his opinion. *Peterson v. National Carriers, Inc.*, 972 S.W.2d 349, 354–55 (Mo. App.1998); section 490.065.3 RSMo (2000). An expert may testify to an opinion based on his or her personal experience, from the results stated in medical literature, or from information learned at professional seminars or courses of study. *See Stallings*, 794 S.W.2d at 269–272; *State v. McFall*, 737 S.W.2d 748, 755 (Mo.App. 1987). In *Stallings*, we held that Missouri case law recognized this rule prior to the enactment of section 490.065. *Stallings*, 794 S.W.2d at 270–71. Section 490.065.3 "does not prohibit an expert from relying on hearsay." *Peterson*, 972 S.W.2d at 354. Rather, that statute

> recognizes the generally accepted principle that an "expert necessarily acquires his knowledge and expertise from many sources, some of which are inadmissible hearsay. Merely because an expert relied on information and opinions of others does not automatically disqualify his testimony. As long as such sources serve only as a background for his opinion and are not offered as independent substantive evidence ... he should not be precluded from testifying."

*Id.* (quoting *State v. Delmar Gardens of Chesterfield*, 872 S.W.2d 178, 182 (Mo.App. 1994)). *See also Davolt v. Highland*, 119 S.W.3d 118, 133 (Mo.App.2003).

■ We will not reverse a trial court's determination of the admissibility of an expert's testimony absent a clear abuse of discretion. *Peterson*, 972 S.W.2d at 354. Plaintiff has not demonstrated an abuse of discretion. Point five is denied.

The judgment of the trial court is affirmed.

ROBERT G. DOWD, JR., J. and
KENNETH M. ROMINES, J., concur.