

# In the Missouri Court of Appeals
## Eastern District

**DIVISION ONE**

| | | |
|---|---|---|
| BENNY L. BELL, | ) | No. ED106320 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Appeal from the Circuit Court |
| HAMID R. REDJAL, M.D., | ) | of the City of St. Louis |
| | ) | 1522-CC10079 |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ORTHOPAEDIC ASSOCIATES OF | ) | Honorable Jimmie M. Edwards |
| SOUTHEAST MISSOURI, P.C. | ) | |
| d/b/a ADVANCED ORTHOPEDIC | ) | |
| SPECIALISTS, | ) | |
| | ) | |
| Appellant. | ) | Filed:  February 26, 2019 |

Orthopaedic Associates of Southeast Missouri, P.C. d/b/a Advanced Orthopedic

Specialists ("Defendant" or "Defendant AOS") appeals the judgment entered upon a jury verdict

awarding Benny L. Bell ("Plaintiff") $4,451,875 in compensatory damages and $5,000,000 in

punitive damages on Plaintiff's claims for medical malpractice arising out of medical care

provided to Plaintiff by Defendant's employee, Hamid R. Redjal, M.D. ("the underlying

defendant Dr. Redjal" or "Dr. Redjal").[1]  We affirm.

---

[1] Dr. Redjal did not appeal the verdict against him and is not a party to this appeal.

# I. BACKGROUND

## A. Facts Giving Rise to this Appeal

Plaintiff is a middle-aged man who enjoyed success in his career as a dancer. He grew up in the small town of Caruthersville, Missouri but eventually moved to Europe to further his career as a performer, choreographer, and dance instructor. At around the age of fifty, Plaintiff began experiencing pain and other symptoms of arthritis in his hip. In 2009, Plaintiff underwent a right hip resurfacing surgery, in which metal components were installed in his right hip. In 2012, Plaintiff's right hip pain recurred. Also around that time, Plaintiff was notified the metal components installed during his 2009 surgery had been recalled and that he would have to undergo another surgery to revise the prior one. Plaintiff then returned to Missouri for a right hip replacement surgery, which was performed by Dr. Ryan Nunley at Barnes Jewish Hospital in St. Louis, Missouri in January 2013. During this surgery, Smith & Nephew, Inc. ("Smith & Nephew") hip replacement components were installed into Plaintiff's right hip.

A few months after the January 2013 surgery, Plaintiff started to experience pain in his left groin area. Plaintiff reported to Dr. Patrick Knight, an orthopedic surgeon and one of the owners of Defendant AOS, who then referred Plaintiff to the care of Defendant AOS's new surgeon, Dr. Redjal. Dr. Redjal performed a successful total hip replacement surgery on Plaintiff's left hip in November 2013. Plaintiff felt great immediately after this surgery, he participated in physical therapy while he was still in the hospital, and he was able to walk on crutches at the time he was discharged from the hospital. On his way to a postoperative follow-up appointment with Dr. Redjal on November 21, 2013, Plaintiff stopped at a McDonald's restaurant where he slipped on a wet floor and fell against a wall. Thereafter, Dr. Redjal referred Plaintiff to Dr. Jimmy Bowen, a physical medicine and rehabilitation physician who worked for Defendant AOS.

2

Dr. Bowen diagnosed Plaintiff with osteitis pubis, a condition causing groin pain that can be treated successfully without surgery. By March 2014, Plaintiff was doing well on the right hip but was still suffering from persistent but improving groin pain on the right side. Dr. Bowen referred Plaintiff back to Dr. Redjal to explore whether there was a problem with the right hip implant.

On April 16, 2014, Dr. Redjal performed what he testified was an "exploratory" surgery on Plaintiff's right hip at Saint Francis Medical Center in Cape Girardeau, Missouri. However, Dr. Redjal said prior to the surgery he actually intended to replace the polyethylene liner from Plaintiff's acetabular component. During surgery, Dr. Redjal employed a power corkscrew device to remove the polyethylene liner from the acetabular cup, which was not the recommended technique to perform this task. After the liner was removed, Dr. Redjal could not get a new one to lock into the cup. Therefore, Dr. Redjal was forced to remove the entire acetabular component from Plaintiff's right hip and install a new one. During this process, Dr. Redjal removed a substantial amount of attached pelvic bone and fractured Plaintiff's pelvis.

Plaintiff was not informed of the pelvic fracture prior to his discharge from the hospital. In the months following his surgery, Plaintiff was ordered to bear weight on his right leg and to undergo physical therapy with Dr. Bowen. Plaintiff had significant difficulty with his postoperative instructions because he was experiencing pain, clicking, and loosening of the right hip implant while standing or walking. Finally, on October 23, 2014, Plaintiff made Dr. Redjal feel the hip implant move inside his body; thereafter, Dr. Redjal ordered a CT scan. This scan revealed Plaintiff's acetabular component was dislocated.

Dr. Redjal was subsequently discharged from his employment with Defendant AOS. Plaintiff had an appointment with Dr. Knight on December 23, 2014 during which Dr. Knight informed Plaintiff there was a problem with his April 16, 2014 surgery and Plaintiff's right leg

3

was not attached. Dr. Knight then referred Plaintiff to the care of Dr. Douglas McDonald, who saw Plaintiff on February 11, 2015. At that time, Dr. McDonald determined Plaintiff's acetabular component was malpositioned and not fixed in bone. Dr. McDonald performed a subsequent surgery to repair Plaintiff's right hip, but it was unsuccessful. As of the time of trial in September 2017, Plaintiff's right hip implant was unattached to his pelvis, Plaintiff could not voluntarily move his right leg, he could not walk without crutches, and he experienced significant limitations in his day-to-day activities.

## B.    Relevant Procedural Posture

Plaintiff subsequently filed his first amended petition ("petition") alleging six claims against four defendants: Smith & Nephew, Rich House Inc. d/b/a McDonald's ("McDonald's), Defendant AOS, and the underlying defendant Dr. Redjal. Specifically, Plaintiff asserted one claim of products liability against Smith & Nephew ("Count I") related to the allegedly defective implants installed in Plaintiff's right hip during the January 2013 surgery performed by Dr. Nunley. Plaintiff also alleged one claim of premises liability against McDonald's ("Count II") based on McDonald's failure to discover, warn, or remove an allegedly unsafe condition, which caused Plaintiff to fall on November 21, 2013. Plaintiff's petition set forth three claims of medical malpractice against Defendant AOS and the underlying defendant Dr. Redjal ("Counts III, IV, and V") arising from Dr. Redjal's negligent treatment of Plaintiff as discussed above. Finally, Plaintiff asserted one claim of negligent supervision, retention, and referral against Defendant AOS ("Count VI"). Plaintiff sought compensatory and punitive damages based on his claims.

Prior to trial, Plaintiff settled his claims against Smith & Nephew and McDonald's. Therefore, he proceeded to try his case on Counts III, IV, and V against Defendant AOS and Dr. Redjal as well as Count VI against Defendant AOS. In support of his claims, Plaintiff testified

4

and presented the testimony of: his retained expert orthopedic surgeon Dr. David King; Defendant AOS owners and employees Dr. August Ritter, Dr. Knight, Dr. Brian Schafer, and Dr. Bowen; Dr. McDonald, who was also designated as an expert; Smith & Nephew representative Michael Swailes; and Plaintiff's retained expert life care planner Nurse Jan Klosterman.

At the close of Plaintiff's evidence, the trial court ruled there was insufficient evidence to support Plaintiff's claim for punitive damages on Count VI. The trial court ultimately submitted Counts III, IV, and V to the jury. The jury returned a verdict in favor of Plaintiff, awarding him $4,451,875 in compensatory damages and $5,000,000 in punitive damages. Defendant AOS appeals.[2]

## II.    DISCUSSION

Defendant AOS raises six points on appeal. In Defendant's first and second points on appeal, which we address together for ease of analysis, Defendant asserts the trial court erred in its rulings relating to evidence of the underlying defendant Dr. Redjal's qualifications and treatment of other patients. In its third and fourth points on appeal, which we also address together, Defendant alleges instructional error as to the verdict directors. In its fifth point on appeal, Defendant contends the court erred in sua sponte limiting its cross-examination of Plaintiff about evidence from his Facebook page and in denying its offer of proof on the subject. And in Defendant's sixth and final point on appeal, it alleges trial court error regarding its

---

[2] To avoid unnecessary repetition, additional relevant facts and procedural posture will be set forth in our analysis in Section II. of this opinion.

requested reduction under section 537.060 RSMo 2000.[3]

## A. Whether the Trial Court Erred with Respect to Evidence of Dr. Redjal's Qualifications and Treatment of Other Patients

In its first and second points on appeal, Defendant AOS asserts the trial court erred in its rulings relating to evidence of the underlying defendant Dr. Redjal's qualifications and treatment of other patients. In Defendant's first point on appeal, it argues the trial court erred in admitting evidence of Dr. Redjal's qualifications and treatment of other patients because the evidence was irrelevant and prejudicial in light of Defendant's admission of respondeat superior. In its second point on appeal, Defendant maintains the court erred in denying its motion for mistrial and subsequent motion for new trial based on the admission of such evidence.

### 1. Standard of Review

The trial court has considerable discretion in determining the admissibility of evidence. *Koelling v. Mercy Hospitals East Communities*, 558 S.W.3d 543, 550 (Mo. App. E.D. 2018). Thus, we defer to a trial court's evidentiary ruling, we presume the ruling is correct, and we will reverse based on evidentiary error only if the court clearly abused its discretion. *Koon v. Walden*, 539 S.W.3d 752, 761 (Mo. App. E.D. 2017). We also review the trial court's decision to deny a motion for mistrial or a motion for new trial for an abuse of discretion. *Palmer v. Union Pacific R. Co.*, 311 S.W.3d 843, 851 (Mo. App. E.D. 2010).

---

[3] All further references to section 537.060 are to RSMo 2000, which is the latest version of the statute. This section provides in relevant part:

> When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, . . . such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.

In its sixth point relied on as well as in the argument portion of its brief, Defendant actually refers to its requested "setoff." The Missouri Supreme Court has noted the affirmative defense under section 537.060 is occasionally referred to as a "setoff," rather than the more accurate term of "reduction." *See Sanders v. Ahmed*, 364 S.W.3d 195, 201 n.2 (Mo. banc 2012). We follow the Supreme Court's direction in referring to it as the defense of reduction. *See id*.

6

An abuse of discretion occurs when the court's ruling is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Koelling*, 558 S.W.3d at 550 (quotations omitted). An abuse of discretion will not be found if reasonable minds could differ as to the propriety of the trial court's action. *Koon*, 539 S.W.3d at 761. We will only reverse the trial court's ruling if it has resulted in a glaring or substantial injustice. *Id.*; *Palmer*, 311 S.W.3d at 851.

### 2. Relevant Facts and Procedural Posture

Prior to trial, Defendant filed a motion in limine asserting Plaintiff should not be allowed to introduce evidence showing Dr. Redjal failed the examination for board certification as an orthopedic surgeon on three occasions. The trial court denied Defendant's motion in limine.

During trial, Defendant objected to Plaintiff's presentation of evidence related to Count VI, which was Plaintiff's claim for negligent supervision, retention, and referral against Defendant AOS. In response, Plaintiff maintained evidence of Dr. Redjal's qualifications and treatment of other patients was relevant and permissible because he was pursuing punitive damages on that claim. The trial court overruled Defendant's objections, and Plaintiff presented evidence showing, (1) Dr. Redjal failed his board certification examination on three occasions; (2) when Dr. Redjal was trying to obtain his license to practice medicine in Missouri, he had difficulty getting a favorable recommendation from the California institution where he completed his residency; (3) Dr. Redjal's residency director from the California institution wrote a letter stating Dr. Redjal's overall performance was not acceptable; and (4) in late 2014, Defendant AOS ended its professional relationship with Dr. Redjal due to his poor treatment of other surgical patients.

7

After the court announced it would not submit Plaintiff's claim of punitive damages on Count VI to the jury, Defendant's counsel requested a mistrial, because the jury had already heard the preceding evidence relevant to that claim. No other relief was requested. The trial court denied Defendant's request for a mistrial, as well as its subsequent motion for new trial arguing the same.

### 3. Relevant Law, Defendant's Arguments, and Analysis

As a general rule, a plaintiff is not allowed to pursue claims against an employer asserting alternative theories of liability in cases where the employer has admitted to respondeat superior liability for its employee's negligence. *McHaffie By and Through McHaffie v. Bunch*, 891 S.W.2d 822, 826 (Mo. banc 1995); *see Wilson v. Image Flooring, LLC*, 400 S.W.3d 386, 391-94 (Mo. App. W.D. 2013). However, this rule is subject to an exception when the plaintiff brings a claim for punitive damages against the employer. *Wilson*, 400 S.W.3d at 391-94; *see also McHaffie*, 891 S.W.2d at 826. The *Wilson* Court aptly explained:

> The rationale for the Court's holding in *McHaffie* was that, where vicarious liability was admitted . . ., the employer's liability was necessarily fixed by the negligence of the employee. Thus, any additional evidence supporting direct liability claims could serve only to waste time and possibly prejudice the defendants.
>
> The same cannot be said, however, when a claim for punitive damages based upon the direct liability theories is raised. If an employer's hiring, training, supervision, or entrustment practices can be characterized as demonstrating complete indifference or a conscious disregard for the safety of others, then the plaintiff would be required to present additional evidence, above and beyond demonstrating the employee's negligence, to support a claim for punitive damages. Unlike in the *McHaffie* scenario, this evidence would have a relevant, non-prejudicial purpose. And because the primary concern in *McHaffie* was the introduction of extraneous, potentially prejudicial evidence, we believe that the rule announced in *McHaffie* does not apply where punitive damages are claimed against the employer, thus making the additional evidence both relevant and material.

400 S.W.3d at 393 (internal citations omitted). The *Wilson* Court also held that in order for a plaintiff to be entitled to the punitive damages exception, he is required only to plead sufficient facts to support a claim of punitive damages. *Id*. at 393-94.

8

We first address Defendant's argument that the trial court erred in admitting the evidence about Dr. Redjal's qualifications and treatment of other patients. The trial court's rulings admitting this evidence were made during pre-trial discussions of motions in limine and during trial when Defendant objected to the evidence. As such, these rulings were made prior to the trial court's pronouncement that it would not submit Plaintiff's claim for punitive damages on Count VI to the jury. Accordingly, when the court decided the evidence was admissible, Plaintiff was still pursuing its punitive damages claim against Defendant AOS on the theory of negligent supervision, retention, and referral.

Implicit in its ruling, the trial court found Plaintiff was entitled to the punitive damages exception because he pled sufficient facts to support his claim for punitive damages on Count VI. *See Wilson*, 400 S.W.3d at 391-94. In light of the allegations pled in Plaintiff's petition as well as the fact Defendant did not challenge the sufficiency of Plaintiff's allegations with a motion to dismiss or motion for summary judgment, we cannot say the trial court's decision to admit the evidence of Dr. Redjal's qualifications and treatment of other patients for this purpose was clearly against the logic of the circumstances then before the court or demonstrated a lack of careful consideration. *See Koelling*, 558 S.W.3d at 550; *Koon*, 539 S.W.3d at 761. The evidence was admitted for a non-prejudicial purpose as it was both relevant and material to support Plaintiff's claim of punitive damages on Count VI for negligent supervision, retention, and referral. *See Wilson*, 400 S.W.3d at 393. Moreover, the admission of the evidence did not violate *McHaffie*. *See McHaffie*, 891 S.W.2d at 826; *Wilson*, 400 S.W.3d at 391-94. Thus, the trial court did not abuse its discretion in admitting the evidence.

We now turn to the trial court's denial of Defendant's motion for mistrial and subsequent motion for new trial based on the fact that after the evidence was admitted, the court determined

9

it would not submit Plaintiff's punitive damages claim on Count VI to the jury.[4]  A mistrial is a drastic remedy that should only be granted in exceptional circumstances.  *Coyle v. City of St. Louis*, 408 S.W.3d 281, 286 (Mo. App. E.D. 2013); *Palmer*, 311 S.W.3d at 854; *Cole ex rel. Cole v. Warren County R-III School Dist.*, 23 S.W.3d 756, 759 (Mo. App. E.D. 2000).  The trial court is in the best position to determine the prejudicial effect of evidence and "to determine whether any resulting prejudice can be ameliorated by less drastic means than declaration of a mistrial."  *Cole*, 23 S.W.3d at 759; *see Wheeler ex rel. Wheeler v. Phenix*, 335 S.W.3d 504, 514 (Mo. App. S.D. 2011).  One less drastic remedy is a limiting instruction for the jury to disregard the allegedly improper evidence, which has been found sufficient to avoid prejudice and cure any error.  *See Warren Davis Properties V, L.L.C. v. United Fire & Casualty Co.*, 111 S.W.3d 515, 527 (Mo. App. S.D. 2003).  When a party requests a mistrial but fails to ask for a curative instruction, we will find the court abused its discretion in declining to grant a mistrial only if the evidence was so prejudicial that its effect could not have been removed by an instruction.  *Id*.

On appeal, Defendant contends the trial court should have declared a mistrial because the evidence relating to Dr. Redjal's qualifications and treatment of other patients "was irrelevant and highly prejudicial," but Defendant fails to adequately explain how it was prejudiced by the evidence.  Other than recounting the complained-of evidence for our Court, Defendant's argument could be read as asserting the evidence was prejudicial merely because the jury heard it and merely because it violated *McHaffie*, which we have already found was not the case.  Further, Defendant asserts "[i]t is easy to believe" the jury would want to punish Defendant based on the evidence related to its negligent supervision, retention, and referral of Dr. Redjal,

---

[4] Specifically, the trial court determined there was insufficient evidence to support Plaintiff's claim for punitive damages as to Count VI.  Plaintiff did not appeal this ruling.

10

and the jury's purported anger "would certainly bleed over into the jury's consideration of their verdict on both compensatory and punitive damages."

We find Defendant's argument as to prejudice to be circular and speculative. Defendant has failed to prove the trial court's actions of denying Defendant's motions for mistrial and new trial resulted in a glaring or substantial injustice, especially in light of its failure to request a curative instruction. *See Koon*, 539 S.W.3d at 761; *Coyle*, 408 S.W.3d at 286; *Palmer*, 311 S.W.3d at 851, 854; *Warren Davis Properties*, 111 S.W.3d at 527; *Cole*, 23 S.W.3d at 759. We are unpersuaded by Defendant's contention that it could not even attempt to formulate an instruction sufficient to cure any potential prejudice resulting from the evidence of Dr. Redjal's qualifications and treatment of other patients. A party's failure to request relief other than a mistrial cannot aid him or her. *See Warren Davis Properties*, 111 S.W.3d at 527. Therefore, the trial court did not abuse its discretion in denying Defendant's motion for mistrial and subsequent motion for new trial. As such, the trial court did not err in its rulings relating to evidence of Dr. Redjal's qualifications and treatment of other patients. Points one and two are denied.

**B.     Whether the Trial Court Committed Instructional Error**

We address Defendant's third and fourth points on appeal in the following order. In the first part of Defendant's fourth point as well as in its third point, Defendant maintains the trial court erred in submitting the verdict directors – Instruction No. Four ("Instruction Four") and Instruction No. Nine ("Instruction Nine") – to the jury because they were not supported by sufficient evidence. In the second part of Defendant's fourth point, Defendant contends the court erred in submitting Instruction Four to the jury because it was a roving commission in that it failed to advise the jury of the ultimate facts necessary to conclude Defendant was negligent.

11

### 1. General Standard of Review

Whether the jury was properly instructed is a question of law subject to de novo review. *Koon*, 539 S.W.3d at 768. A proper instruction must be supported by the evidence, follow the substantive law, and be readily understood by the jury. *Huelskamp v. Patients First Health Care, LLC*, 475 S.W.3d 162, 173 (Mo. App. E.D. 2014); *Fletcher v. Kansas City Cancer Center, LLC*, 296 S.W.3d 474, 478 (Mo. App. W.D. 2009). In reviewing an alleged instructional error, we view the evidence in the light most favorable to its submission and disregard evidence to the contrary. *Id*. The party asserting instructional error must prove the allegedly improper instruction misdirected, misled, or confused the jury. *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 553 (Mo. App. E.D. 2016). We will reverse based on instructional error only if the error resulted in prejudice that materially affected the merits of the case. *Koon*, 539 S.W.3d at 768.

### 2. Whether the Verdict Directors Were Supported by Sufficient Evidence

We first turn to Defendant's assertion that the verdict directors were not supported by sufficient evidence. A verdict-directing instruction, such as Instruction Four and Instruction Nine in this case, must be supported by substantial evidence in order to be appropriately submitted to the jury. *Brown v. Bailey*, 210 S.W.3d 397, 410 (Mo. App. E.D. 2006). "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Id*. (quotations omitted). Where, as in this case, the verdict-directing instruction contains alternative submissions of acts giving rise to liability, each submission must be supported by substantial evidence. *See Ploch v. Hamai*, 213 S.W.3d 135, 138, 140 (Mo. App. E.D. 2006) (each submission in a disjunctive instruction, i.e., an instruction containing alternative submissions of acts giving rise to liability, must be supported by substantial evidence); *see also Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 74 (Mo. banc 1990)

12

(overruled on other grounds by *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996)); Note on Use No. 1 to Missouri Approved Instruction ("MAI") 10.02.[5]

### a. Instruction Four

In this case, Instruction Four was the verdict director given to the jury as to Plaintiff's medical malpractice claims against Defendant AOS and Dr. Redjal. Instruction Four stated:

> On the claim of Plaintiff Benny Bell for compensatory damages for personal injury against Defendants Advanced Orthopedic Specialists and Hamid Redjal, M.D. your verdict must be for Plaintiff Benny Bell if you believe:
>
> First, Defendant Hamid Redjal, M.D. either:
>
> (a) performed unnecessary right hip surgery on April 16, 2014; or
>
> (b) damaged the liner and cup and removed excessive bone during the right hip surgery on April 16, 2014; or
>
> (c) failed to inform Plaintiff Benny Bell of fractures which occurred during the April 16, 2014 surgery; or
>
> (d) delayed treatment of the fractures which occurred during the April 16, 2014 surgery; or
>
> (e) instructed Plaintiff Benny Bell to participate in physical therapy and to put weight on the right leg despite persistent pain after the April 16, 2014 surgery; and
>
> Second, Defendant Hamid Redjal, M.D. was thereby negligent; and
>
> Third, as a direct result of such negligence plaintiff sustained damage.

Based on the foregoing instruction, Defendant argues Paragraph First subsections (b) and (d) were not supported by sufficient evidence because they were not supported by expert testimony. Defendant is correct in stating Plaintiff was required to present expert testimony on the issues of the applicable standard of care and causation. *See, e.g.*, *Bailey*, 210 S.W.3d at 408; *Wright v. Barr*, 62 S.W.3d 509, 524 (Mo. App. W.D. 2001); *Baker v. Gordon*, 759 S.W.2d 87,

---

[5] All further references to the MAI, its Notes on Use, and Committee Comments are to the versions found in the Missouri Approved Instructions-Civil (7th ed. 2012).

13

91 (Mo. App. W.D. 1988); *Delisi v. St. Luke's Episcopal-Presbyterian Hosp., Inc.*, 701 S.W.2d 170, 173 (Mo. App. E.D. 1985). The flaw with Defendant's argument, however, is its assumption, without citation to authority, that only the testimony of Plaintiff's retained expert witness, Dr. King, should be considered in determining whether Plaintiff presented sufficient evidence to support its instruction.

In so arguing, Defendant disregards case law providing, (1) we must view the evidence in the light most favorable to Instruction Four's submission; and (2) we may look at any evidence favorable to Plaintiff in determining whether sufficient evidence existed to support the instruction. *See Huelskamp*, 475 S.W.3d at 173; *Fletcher*, 296 S.W.3d at 478; *see also, e.g.*, *Fletcher*, 296 S.W.3d at 479-80 (discussing plaintiff's expert's testimony in conjunction with other testimony in deciding there was sufficient standard of care evidence); *Wright*, 62 S.W.3d at 526-28 (considering plaintiff's expert's testimony as well as other testimony in finding there was sufficient standard of care and causation evidence); *Ladish v. Gordon*, 879 S.W.2d 623, 633-35 (Mo. App. W.D. 1994) (acknowledging defendant's evidence favorable to plaintiff in concluding plaintiff presented sufficient standard of care evidence); *Baker*, 759 S.W.2d at 91 (defendant's evidence may help establish the standard of care); *Delisi*, 701 S.W.2d at 173 (same). Moreover, we do not view one expert's testimony in a vacuum, but must consider it in the context of all the evidence presented at trial. *Mitchell v. Evans*, 284 S.W.3d 591, 595 (Mo. App. W.D. 2008); *see*

14

*also Fletcher*, 296 S.W.3d at 479 (we consider expert testimony as an integrated whole).[6]

Bearing in mind the preceding guidelines relevant to our review, we now discuss whether Paragraph First subsections (b) and (d) were supported by sufficient evidence.

### i.      Paragraph First Subsection (b)

Paragraph First subsection (b) required the jury to find Dr. Redjal "damaged the liner and cup and removed excessive bone during the right hip surgery on April 16, 2014[.]"  As to this subsection, Plaintiff presented the following evidence on the issues of standard of care and causation.

The evidence adduced at trial indicated the acetabular cup implanted in Plaintiff's hip contained a locking mechanism, which connected the cup to a plastic polyethylene liner that could be removed while the cup remained in place.  Swailes, the Smith & Nephew representative present during Plaintiff's surgery, testified Smith & Nephew provided a tool to remove the polyethylene liner from the specific type of acetabular cup installed in Plaintiff's hip.

Swailes was aware Dr. Redjal did not like to use the recommended tool but preferred to use a power corkscrew device to remove the polyethylene liner.  The two had discussed this issue prior to Plaintiff's April 16, 2014 surgery and may have had the same conversation on the day of the surgery.  In fact, Swailes testified he warned Dr. Redjal against using the power corkscrew device to remove the polyethylene liner from Plaintiff's acetabular cup because there

---

[6] We acknowledge some of the citations in this paragraph are from cases dealing with challenges to the submissibility of a plaintiff's negligence claim and are not within the context of claims asserting the plaintiff's negligence verdict director was not supported by sufficient evidence.  While these are distinct concepts that should not be conflated, we find the cases instructive because in reviewing both types of claims on appeal, an appellate court must decide whether the plaintiff presented substantial evidence, i.e., evidence that is probative of the issues and from which the jury can render a decision.  As an example, this Court in *Brown v. Bailey* stated in order for plaintiff to make a submissible case, he must present substantial evidence to support every fact essential to liability. 210 S.W.3d at 404.  Subsequently, in addressing the defendant's challenge to the verdict director, the court declared, "[a] verdict directing instruction . . . should only be submitted by the trial court when it is supported by substantial evidence."  *Id*. at 409-10; *see also Williams v. Daus*, 114 S.W.3d 351, 358-59, 363 (Mo. App. S.D. banc 2003) (declaring as to submissibility, plaintiff must present substantial evidence as to each fact necessary for recovery, and later stating with respect to whether there was sufficient evidence to support a verdict director, "every element of a verdict director must be supported by substantial evidence") (quotations omitted).

was a risk the corkscrew device would damage the cup's locking mechanism and it would not be able to accept a new liner. Swailes also told Dr. Redjal to be careful not to drill into the locking mechanism. Nevertheless, Dr. Redjal refused to use the Smith & Nephew tool, but instead used the power corkscrew device. During Plaintiff's surgery, Dr. Redjal struggled to remove the polyethylene liner, damaged the liner by drilling into it several times, and was unable to replace it with a new liner because the liner would not lock into the acetabular cup.

Dr. King, Plaintiff's retained expert orthopedic surgeon, testified the standard of care required Dr. Redjal, upon determining he needed to remove the polyethylene liner from Plaintiff's acetabular cup, to use the specific tool designed to remove the liner. Dr. Redjal failed to do so, and in Dr. King's opinion based on the evidence and deposition testimony he reviewed,[7] Dr. Redjal damaged the locking mechanism of the acetabular cup through his use of the power corkscrew device. Although Dr. King acknowledged other surgeons used the power corkscrew device, to his knowledge those doctors only employed that method when the implants being worked on did not have a designed tool to remove its polyethylene liner. Dr. King stated Dr. Redjal deviated from the standard of care in the technical way he performed Plaintiff's April 16, 2014 surgery.

Moreover, Dr. King's testimony indicates that because Dr. Redjal had damaged the liner and cup through his use of the power corkscrew device, he was unable to lock a new liner into the cup and was thus forced to remove the entire acetabular component to install a new one. Along with the acetabular component, Dr. Redjal removed an excessive amount of bone from Plaintiff's hip. Dr. King and Dr. McDonald both testified Dr. Redjal deviated from the standard of care in doing so. These actions resulted in damage to Plaintiff because by Dr. Redjal's own

---

[7] Prior to testifying as to his opinions in this case, Dr. King explained to the jury the standard of care applicable to this case and agreed with Plaintiff's counsel that all of his opinions would be expressed to a reasonable degree of professional certainty.

16

admission made to Dr. Schafer, who was an owner of Defendant AOS and the chairman of orthopedic surgery at Saint Francis Medical Center, Dr. Redjal "cracked" Plaintiff's pelvis while trying to get the cup out. Further, Dr. McDonald found the destruction of and fractures to Plaintiff's pelvis as well as the malposition of the new acetabular component resulted from Dr. Redjal's failures during the April 16, 2014 surgery.

We find, in considering Plaintiff's expert testimony in the context of all the evidence viewed in the light most favorable to submission of Instruction Four, Plaintiff presented substantial evidence from which the jury could have found Dr. Redjal violated the standard of care by damaging the liner and cup and removing excessive bone during the right hip surgery on April 16, 2014, and that as a result, Plaintiff sustained damage. *See Bailey*, 210 S.W.3d at 410. While Defendant complains Dr. King's testimony did not track the exact language of subsection (b) that Dr. Redjal "damaged the liner and cup," he was not required to do so. *See Mitchell*, 284 S.W.3d at 595 (similarly finding). Dr. King clearly stated Dr. Redjal was required by the standard of care to use the specific tool designed to remove the polyethylene liner, and Swailes testimony confirmed there was such a tool designed to remove the liner from Plaintiff's specific acetabular component. Because of his deviation from the standard of care, Dr. Redjal damaged the liner and cup and removed excess bone along with the acetabular component. Furthermore, the expert testimony, when read as a whole, constitutes substantial evidence probative on the issue of causation. *See id*. at 595-96; *see also Fletcher*, 296 S.W.3d at 479. Accordingly, subsection (b) was consistent with and supported by the evidence.

ii.    **Paragraph First Subsection (d)**

Paragraph First subsection (d) required the jury to find Dr. Redjal "delayed treatment of the fractures which occurred during the April 16, 2014 surgery[.]" With respect to this subsection, the following evidence was presented as to the standard of care and causation. Dr.

17

King testified to a reasonable degree of certainty that Plaintiff's condition after the April 16, 2014 surgery could have been improved by: having Plaintiff stop weight bearing on his right leg; informing Plaintiff about the fractures; obtaining additional imaging to determine the exact pattern of the fractures; and then developing a plan as to how to restore Plaintiff's anatomy to where it should be. Dr. King testified it was necessary for Plaintiff to stop weight bearing because bearing weight on his right leg would cause the fracture line to expand, prevent healing, and cause Plaintiff's implant to shift. Dr. King said an immediate additional surgery would have been required as part of the action plan to restore Plaintiff's anatomy to where it should be.

Furthermore, Dr. King opined Dr. Redjal failed to comply with the standard of care if he put Plaintiff on a weight bearing regimen after the April 16, 2014 surgery. Based on the postoperative medical records, that is exactly what Dr. Redjal did when he ordered Plaintiff to be thirty pounds weight bearing on April 16 and May 1, 2014, then ordered him to be full weight bearing on May 22, 2014. The medical records also reveal from after the April 16, 2014 surgery through October 2014 Dr. Redjal was encouraging Plaintiff to bear more weight on his right leg, the opposite of what he acknowledged was the appropriate treatment of a pelvic fracture.

Additionally, Dr. King and Dr. McDonald both testified about the records of Plaintiff's physical therapy and appointments with Dr. Redjal subsequent to the April 16, 2014 surgery. Taken as a whole, their testimony along with information included in those records reveal Dr. Redjal's failure to treat Plaintiff's pelvic fracture was resulting in additional damage to Plaintiff in that his subjective complaints of pain were worsening as well as the objective fact his x-rays were showing additional fracture lines. *See Fletcher*, 296 S.W.3d at 479 and *Mitchell*, 284 S.W.3d at 595 (we must consider expert testimony as a whole and in the context of other medical evidence). Based on the foregoing, we find Plaintiff presented substantial evidence from which the jury could have found Dr. Redjal violated the standard of care by delaying treatment of the

18

fractures which occurred during the April 16, 2014 surgery, and that as a result, Plaintiff

sustained damage. *See Bailey*, 210 S.W.3d at 410.

### iii. Conclusion as to Defendant's Claim that Instruction Four was not Supported by Sufficient Evidence

In light of the preceding evidence presented at trial, we find the trial court did not err in

submitting the verdict director Instruction Four to the jury because Paragraph First subsections

(b) and (d) were supported by sufficient evidence. The first part of Defendant's fourth point on

appeal is denied.

### b. Instruction Nine

We now turn to Instruction Nine, which was the verdict director read to the jury as to

Plaintiff's claim for punitive damages against Defendant AOS and Dr. Rejdal. Instruction Nine

provided in relevant part:

> If you find in favor of [P]laintiff under [Instruction Four], and if you believe that:
> First, Defendant Hamid Redjal, M.D. either:
>
> (a) performed unnecessary right hip surgery on April 16, 2014; or
>
> (b) damaged the liner and cup and removed excessive bone during the right hip surgery on April 16, 2014; or
>
> (c) failed to inform Plaintiff Benny Bell of fractures which occurred during the April 16, 2014 surgery; or
>
> (d) delayed treatment of the fractures which occurred during the April 16, 2014 surgery; or
>
> (e) instructed Plaintiff Benny Bell to participate in physical therapy and to put weight on the right leg despite persistent pain after the April 16, 2014 surgery; and
>
> Second, defendant knew or had information from which defendant, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury, and
>
> Third, defendant thereby engaged in willful, wanton or malicious misconduct,

Then, in addition to any damages to which you find plaintiff entitled under [Instruction Four] you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and deter defendant and others from like conduct.

. . .

Initially, we must clarify Defendant's argument with respect to the preceding Instruction Nine. Defendant's brief on appeal asks this Court to decide its third point on appeal by employing the standard of review and general law applicable for analyzing the submissibility of a punitive damages claim. However, we find Defendant's argument as preserved throughout the proceedings is more appropriately characterized as a challenge to the submissibility of the punitive damages instruction because Defendant argues the evidence is insufficient as it relates to the language of Instruction Nine.[8] *See Wieland v. Owner-Operator Services, Inc.*, 540 S.W.3d 845, 850 n.3 (Mo. banc 2018). Therefore, we address Defendant's point as such and proceed to discuss whether Instruction Nine was supported by sufficient evidence.

### i.    Relevant Law Pertaining to Punitive Damages

In pursuing punitive damages under section 538.210.5 RSMo Supp. 2006[9] against a healthcare provider in a medical malpractice case, a plaintiff must present clear and convincing evidence showing: (1) the healthcare provider engaged in outrageous conduct;[10] and (2) such conduct was performed with a willful, wanton, or malicious culpable mental state. *See Dodson*

---

[8] As our Missouri Supreme Court recently clarified:
> A submissibility-of-the-claim challenge argues the plaintiff's claim should not go to the jury because substantial evidence does not support the claim as provided by the substantive law. A submissibility-of-the-instruction challenge argues a specific instruction should not be given to the jury because substantial evidence does not support an issue as provided by that instruction. The former compares the evidence with the substantive law, while the latter compares the evidence specifically with the instruction.

*Wieland v. Owner-Operator Services, Inc.*, 540 S.W.3d 845, 850 n.3 (Mo. banc 2018) (citations omitted). While the parties have conflated the two issues in addressing Defendant's third point on appeal, the argument portion of Defendant's brief undeniably compares the evidence specifically with the language of Instruction Nine just as Defendant argued in his submissibility-of-the-instruction portion of his fourth point on appeal. Accordingly, we conclude Defendant's third point on appeal is fairly and appropriately characterized as a "submissibility-of-the-instruction challenge." *See id.*

[9] The reference to section 538.210.5 is to RSMo Supp. 2006, which incorporates legislative amendments through 2005 and was the version of the statute in effect at the time the events giving rise to this appeal occurred.

[10] Defendant does not contest this element on appeal.

*v. Ferrara*, 491 S.W.3d 542, 562 (Mo. banc 2016); *Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. App. E.D. 2017). For purposes of punitive damages, acting willfully, wantonly, or maliciously is equivalent to acting with a complete indifference to or in conscious disregard for the rights or safety of others. *See Koon*, 539 S.W.3d at 769-72. "Conscious disregard or complete indifference involves [a] situation[] where a person acts or fails to act while being conscious from the knowledge of surrounding circumstances and existing conditions, that, although lacking a specific intent to injure, the person's conduct or failure to act will naturally and probably result in injury." *Poage*, 523 S.W.3d at 520 (quotations omitted); *see Peters v. General Motors Corp.*, 200 S.W.3d 1, 24 (Mo. App. W.D. 2006); *see also Koon*, 539 S.W.3d at 773.

### ii.      Relevant Facts and Analysis

Pursuant to the preceding law and the standard of review applicable to Defendant's specific claim before this Court, we must determine whether Plaintiff presented substantial evidence, i.e., evidence probative of the issues and from which the jury can decide the case, showing Dr. Redjal committed the five acts submitted in Instruction Nine Paragraph First with a complete indifference to or in conscious disregard for Plaintiff's safety.[11] *See Dodson*, 491 S.W.3d at 562; *Menaugh*, 799 S.W.2d at 74; *Poage*, 523 S.W.3d at 515; *Koon*, 539 S.W.3d at 769-72; *Ploch*, 213 S.W.3d at 138, 140; *Bailey*, 210 S.W.3d at 410; Note on Use No. 1 to MAI 10.02.

---

[11] Although Defendant's argument, consistent with Instruction Nine, actually uses the "willful, wanton, or malicious" standard as opposed to the "complete indifference or conscious disregard" standard supplied by the MAI and referred to in case law, this fact does not impact our discussion because willful, wanton, or malicious misconduct for purposes of punitive damages is equivalent to acting with a complete indifference to or in conscious disregard for the rights or safety of others. *See Koon*, 539 S.W.3d at 769-72.

### aa. Paragraph First Subsection (a)

Paragraph First subsection (a) required the jury to find Dr. Redjal "performed unnecessary right hip surgery on April 16, 2014[.]" Plaintiff presented the following evidence as to whether Defendant engaged in this conduct with a complete indifference to or in conscious disregard for Plaintiff's safety. A few months after Plaintiff's successful November 2013 left total hip replacement surgery performed by Dr. Redjal, Dr. Bowen determined Plaintiff suffered from osteitis pubis, a condition causing groin pain that can be treated successfully without surgery. Plaintiff thought he was finally on the right track to recovery, and Dr. Bowen thought Plaintiff would only need a more sophisticated injection to treat the osteitis pubis. While Plaintiff had recovered "99.9%" of his ability to function on the right hip, he was still experiencing some persistent but improving groin pain on the right side. For this reason, Dr. Bowen referred Plaintiff back to Dr. Redjal to explore whether there was a problem with the right hip implant.

Dr. Redjal initially considered surgical intervention during an appointment with Plaintiff on March 6, 2014. Based on x-rays performed prior to that appointment, Dr. Redjal concluded they showed possible loosening of Plaintiff's right hip implant. However, Dr. King testified the relevant x-rays performed prior to this March 6 appointment did not show loosening of Plaintiff's hip implant components. Similarly, Dr. McDonald, who subsequently treated Plaintiff and was designated as an expert in this case, found the x-rays did not indicate the component was failing, loosening, or exhibiting wear.

Dr. Redjal also reviewed an ultrasound performed by Dr. Bowen prior to the March 6 appointment. Dr. Redjal noted the ultrasound revealed fluid around the right hip arthroplasty device. However, Dr. McDonald testified joint fluid was expected after arthroplasty and relatively common in patients who had previously had a metal-on-metal implant. Dr. McDonald

22

further testified the amount of fluid in Plaintiff's hip was not a cause for concern and did not suggest his right hip component was loose.

Based upon his readings of the x-rays and ultrasound, Dr. Redjal planned to get a bone scan and then consider whether surgical intervention was necessary. On March 12, 2014, the bone scan was performed, which revealed there was no loosening or infection on the components in Plaintiff's right hip. Although Dr. Redjal admitted the radiology report confirmed there was no loosening of the components shown by the bone scan, the next medical record he authored states Plaintiff was "[s]tatus post right total hip replacement with loosening of components." Dr. Redjal's record also only noted the bone scan was negative for infection, but he apparently ignored the bone scan finding that it was negative for loosening.

Although Dr. Redjal ordered the bone scan to determine if surgical intervention was needed, the medical records prove he knew there was no loosening of the components but proceeded with the April 16, 2014 surgery anyway. Dr. Redjal performed the surgery prior to conducting additional tests to determine the actual cause of Plaintiff's right groin pain, which Dr. King testified were available. Accordingly, the evidence showed the April 16, 2014 surgery was not necessary or required under the surrounding circumstances and in light of Plaintiff's then existing physical condition. We find the foregoing evidence constituted substantial evidence from which the jury could have found Dr. Redjal performed unnecessary right hip surgery on April 16, 2014 with a complete indifference to or in conscious disregard for Plaintiff's safety. *See id.*

### bb. Paragraph First Subsection (b)

Paragraph First subsection (b) required the jury to find Dr. Redjal "damaged the liner and cup and removed excessive bone during the right hip surgery on April 16, 2014[.]" In addition to the aforementioned evidence relevant to this act, *see* section B.2.a.i., Plaintiff presented the

following evidence as to whether Dr. Redjal engaged in this conduct with a complete indifference to or in conscious disregard for Plaintiff's safety.

Dr. Redjal used the power corkscrew device to remove the polyethylene liner from Plaintiff's acetabular cup despite the fact Smith & Nephew provided a tool specifically for that purpose, despite the fact Swailes warned Dr. Redjal against using the power corkscrew device because of the risk the device would damage the cup's locking mechanism so it would not be able to accept a new liner, and despite the fact Swailes told Dr. Redjal to be careful not to drill into the locking mechanism. During the surgery, Dr. Redjal struggled to remove the polyethylene liner, damaged the liner by drilling into it several times, and was unable to replace it with a new liner because the liner would not lock into the acetabular cup. Dr. King opined Dr. Redjal damaged the mechanism that locked the polyethylene liner into the acetabular cup through his action of "drilling some sort of corkscrew device into it and yanking it out versus using the tool that's designed to remove it."

Because Dr. Redjal disregarded the warning of Swailes to either use the tool provided by Smith & Nephew to remove the liner or to be careful not to drill into the locking mechanism, Dr. Redjal damaged the locking mechanism on the acetabular cup implanted in Plaintiff's hip and was unable to install a new polyethylene liner. Therefore, he was forced to remove the entire acetabular component, taking with it a significant amount of Plaintiff's bone, in order to install a new component with a functional locking mechanism. We find the foregoing evidence constituted substantial evidence from which the jury could have found Dr. Redjal damaged the liner and cup and removed excessive bone during the right hip surgery on April 16, 2014 with a complete indifference to or in conscious disregard for Plaintiff's safety. *See id.*

24

### cc.    Paragraph First Subsection (c)

Paragraph First subsection (c) required the jury to find Dr. Redjal "failed to inform Plaintiff Benny Bell of fractures which occurred during the April 16, 2014 surgery[.]"  Plaintiff presented the following evidence as to whether Dr. Redjal engaged in this conduct with a complete indifference to or in conscious disregard for Plaintiff's safety.  When Dr. Redjal was subsequently approached by Dr. Schafer about what occurred during Plaintiff's April 16, 2014 surgery, Dr. Redjal admitted he "cracked" Plaintiff's pelvis during the surgery when he tried to remove the acetabular cup.  Dr. Redjal also admitted during his deposition testimony that the postoperative x-rays revealed a fracture line on the pubic ramus.  Further, Dr. Redjal acknowledged the radiology report generated prior to Plaintiff's discharge from the hospital, which confirmed the broken pubic ramus.

Notwithstanding Dr. Redjal's knowledge of Plaintiff's pelvic fracture, Dr. Redjal did not tell Plaintiff he had any broken bones or fractures in his hip prior to Plaintiff's discharge from the hospital.  Further, Plaintiff's discharge summary did not mention the fractures.  Even though the fractures of Plaintiff's pelvis occurred during the April 16, 2014 surgery, Plaintiff was not told his acetabulum or pelvis was fractured until over eight months later, when he had his appointment with Dr. Knight on December 23, 2014.[12]  We find the aforementioned evidence constituted substantial evidence from which the jury could have found Dr. Redjal failed to inform Plaintiff of fractures which occurred during the April 16, 2014 surgery with a complete indifference to or in conscious disregard for Plaintiff's safety.  *See* Section 538.210.5; *Dodson*,

---

[12] Although Plaintiff testified on cross-examination that Dr. Redjal told him after surgery that "he had trouble getting something out and something broke," viewing this evidence in the light most favorable to the submission of Instruction Nine, this statement could have pertained to Dr. Redjal telling Plaintiff about how he had trouble getting the polyethylene liner out and that the locking mechanism of the acetabular component broke.  *See Huelskamp*, 475 S.W.3d at 173; *Fletcher*, 296 S.W.3d at 478.  Under our standard of review, we also disregard Dr. Redjal's testimony that he told Plaintiff about the fractures.  *See id*.

491 S.W.3d at 562; *Poage*, 523 S.W.3d at 515; *Koon*, 539 S.W.3d at 769-72; *Ploch*, 213 S.W.3d at 138, 140; *Bailey*, 210 S.W.3d at 410; *Wright*, 62 S.W.3d at 526.

### dd. Paragraph First Subsection (d)

Paragraph First subsection (d) required the jury to find Dr. Redjal "delayed treatment of the fractures which occurred during the April 16, 2014 surgery[.]"  In addition to the aforementioned evidence relevant to this act, *see* section B.2.a.ii., Plaintiff presented the following evidence as to whether Dr. Redjal engaged in this conduct with a complete indifference to or in conscious disregard for Plaintiff's safety.

Dr. Redjal was aware he fractured Plaintiff's pubic ramus during surgery, but he believed the fractures would not change anything in the postoperative plan because Plaintiff would be non-weight bearing and the fractures would heal on their own.  However, the medical records indicate Dr. Redjal did not follow what he testified would be the appropriate treatment for a pelvic fracture because he ordered Plaintiff to bear weight on his right leg after the surgery.  Despite the fact the radiology report generated prior to Plaintiff's discharge from the hospital said "finding suspicious for comminuted fracture of the right pelvis extending through the right acetabular region" and recommended a CT scan for further insight, Dr. Redjal did not order a CT scan.  In fact, nothing in the postoperative records indicates Dr. Redjal was checking on or treating Plaintiff's pelvic fractures.  Dr. McDonald found Dr. Redjal's records were inaccurate because they did not mention Plaintiff's fractures and repeatedly said the implants were in the appropriate position when they were not.  It was not until October 23, 2014, over six months after surgery, that Dr. Redjal ordered a CT scan on Plaintiff's pelvis "to see what was going on with the bone healing."  By that point, Plaintiff's acetabular component was dislocated and his fractures had worsened.

26

We find the preceding evidence constituted substantial evidence from which the jury could have found Dr. Redjal delayed treatment of the fractures which occurred during the April 16, 2014 surgery with a complete indifference to or in conscious disregard for Plaintiff's safety. *See id.*

### ee.    Paragraph First Subsection (e)

Paragraph First subsection (e) required the jury to find Dr. Redjal "instructed Plaintiff Benny Bell to participate in physical therapy and to put weight on the right leg despite persistent pain after the April 16, 2014 surgery[.]"  Plaintiff presented the following evidence as to whether Defendant engaged in that conduct with a complete indifference to or in conscious disregard for Plaintiff's safety.

In addition to the preceding evidence showing Dr. Redjal knew about the fractures he caused during Plaintiff's April 16, 2014 surgery, failed to inform Plaintiff of them, and failed to treat them, there was additional evidence showing Dr. Redjal affirmatively directed Plaintiff to undergo physical therapy and to bear weight on his right leg after the surgery despite the fact Plaintiff's condition was worsening.  Dr. McDonald testified that in Plaintiff's condition after the surgery, physical therapy and weight bearing would not help Plaintiff and would cause the implant to shift further upward.  Nonetheless, Dr. Redjal ordered Plaintiff to be thirty pounds weight bearing immediately after his surgery despite his knowledge the appropriate treatment for a pelvic fracture was for the patient to avoid weight bearing so the fracture could heal on its own.  Dr. Redjal again ordered Plaintiff to be thirty pounds weight bearing on May 1 and to be full weight bearing on May 22, 2014.

Plaintiff was ordered to begin physical therapy six weeks after the April 16, 2014 surgery.  However, Plaintiff was not successful at physical therapy because he was only able to do very little due to his pain.  After Dr. Bowen wrote a letter to Dr. Redjal explaining Plaintiff's

27

difficulties doing his exercises, Plaintiff visited Dr. Redjal at which point he was leaning to his left side and could not straighten his hips. Dr. Redjal lifted Plaintiff up on top of his right leg and told Plaintiff to keep it there. However, when Plaintiff tried to walk, his implant was moving up and down inside of his hip with each step he took. Dr. Redjal told Plaintiff to tell Dr. Bowen to "stop treating [Plaintiff] like a baby."

About two-and-a-half months after surgery, Plaintiff was still telling Dr. Redjal he was having difficulty bearing weight on the right leg but Dr. Redjal was reinforcing that he needed to put weight on it. On August 28, 2014, Dr. Redjal signed and acknowledged a physical therapy note from the day before in which Dr. Bowen said Plaintiff was complaining of pain, clicking, and loosening of the right hip when standing or walking; the note also declared "further evaluation on the right hip appears needed." However, it was not until October 23, 2014, over six months after surgery, that Dr. Redjal ordered a CT scan of Plaintiff's pelvis "to see what was going on with the bone healing." By that point, Plaintiff's acetabular component was dislocated and his fractures had worsened. We find this evidence constituted substantial evidence from which the jury could have found Dr. Redjal instructed Plaintiff to participate in physical therapy and to put weight on the right leg despite persistent pain after the April 16, 2014 surgery with a complete indifference to or in conscious disregard for Plaintiff's safety. *See id.*

### iii. Conclusion as to Defendant's Claim that Instruction Nine was not Supported by Sufficient Evidence

In sum, the evidence adduced at trial reveals the following course of events. When Plaintiff first complained of persistent but improving groin pain, x-rays, an ultrasound, and a bone scan were performed. Although Dr. Redjal planned to get the bone scan and then consider whether surgical intervention was necessary, he consciously disregarded the negative results of such scan and rushed into an unnecessary, or at the very least, premature surgery on Plaintiff's right hip. During this surgery, Dr. Redjal willfully refused to use the proper tool to remove the

28

polyethylene liner and failed to heed the Smith & Nephew representative's warning not to damage the locking mechanism on the acetabular component implanted in Plaintiff's right hip. Due to these failures, Dr. Redjal damaged the polyethylene liner as well as the locking detail in the acetabular component, which led to him having to remove Plaintiff's entire right hip implant, removing excessive bone along with it, and fracturing Plaintiff's pelvis.

Although Dr. Redjal was conscious of the fact he fractured Plaintiff's pelvis during surgery based on postoperative x-rays, he failed to report the fractures in his medical records, failed to properly diagnose them, and failed to inform Plaintiff about them. To make matters worse, Dr. Redjal failed to follow what he considered the appropriate treatment for a pelvic fracture, failed to follow-up or monitor the healing of the fractures, and consistently encouraged Plaintiff to undergo painful physical therapy and bear weight on the right leg. We find this string of negligent acts by Dr. Redjal, performed while he was conscious of surrounding circumstances and existing conditions indicating that his actions would naturally and probably result in injury to Plaintiff, were done with a complete indifference to or in conscious disregard for Plaintiff's health and safety. *See Poage*, 523 S.W.3d at 520; *General Motors Corp.*, 200 S.W.3d at 24; *see also Koon*, 539 S.W.3d at 773.

Based on the foregoing conduct established by substantial evidence, we conclude the trial court did not err in submitting the verdict director Instruction Nine to the jury because Plaintiff presented sufficient evidence showing Dr. Redjal acted with a complete indifference to or in conscious disregard for Plaintiff's safety as to each of the five disjunctive acts submitted in Paragraph First. Point three is denied.

29

### 3.    Whether Instruction Four was a Roving Commission

In the second part of Defendant AOS's fourth point on appeal, Defendant asserts Instruction Four Paragraph First subsections (c) and (d)[13] constituted roving commissions because the use of the term "fractures" rather than "fracture" in those subsections failed to advise the jury of the ultimate facts necessary to conclude Defendant was negligent.  We disagree.

A jury instruction constitutes a "roving commission when it assumes a disputed fact . . . that allows the jury to roam freely through the evidence and choose any facts which suited its fancy or its perception of logic to impose liability."  *Lindquist v. Scott Radiological Group, Inc.*, 168 S.W.3d 635, 653 (Mo. App. E.D. 2005) (internal quotations omitted).  In other words, an instruction is a roving commission if it fails to advise the jury which of the defendant's acts or omissions would result in a finding of liability.  *Huelskamp*, 475 S.W.3d at 173.  Further, an instruction may constitute a roving commission when the language is too general.  *Coon v. Dryden*, 46 S.W.3d 81, 93 (Mo. App. W.D. 2001).

In contrast, an instruction is not a roving commission when the "plaintiff's theory of the case is supported by the evidence and the instruction submits ultimate facts which define for the jury the plaintiff's theory of negligence[.]"  *Lindquist*, 168 S.W.3d at 653.  We are primarily concerned with whether a phrase used in the verdict director was misleading in the context of the evidence presented at trial.  *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 767 (Mo. banc 2010).   If the testimony presented at trial sufficiently explained and thereby gave meaning to the language of the verdict director, the instruction is not a roving commission.  *Id*.; *see also Williams v. Daus*, 114 S.W.3d 351, 370-72 (Mo. App. S.D. banc 2003).

---

[13] In the argument portion of its brief, Defendant actually maintains Paragraph First subsections (b) and (d) constituted roving commissions for their use of the term "fractures."  We note, however, subsection (b) does not include that word but subsection (c) does.  We also note, as pointed out by Plaintiff in his brief, Defendant objected to subsections (c) and (d) on this basis during the instruction conference.  For these reasons, we believe Defendant made a clerical error in its brief and meant to argue subsections (c) and (d) constituted roving commissions; we gratuitously address its argument as such.

As an initial matter, we acknowledge that if Paragraph First subsections (c) and (d) merely required the jury to find Dr. Redjal "failed to inform Plaintiff Benny Bell of fractures" or "delayed treatment of fractures[,]" the instruction would have certainly been too general. *See Lindquist*, 168 S.W.3d 635; *Coon*, 46 S.W.3d at 93. However, that is not what the instruction submitted in this case. Instead, subsections (c) and (d) used the term "fractures" immediately followed by the limiting language "which occurred during the April 16, 2014 surgery." The inclusion of this limiting language, which has been entirely ignored by Defendant on appeal, helped adequately define the ultimate facts necessary for the jury to understand Plaintiff's theory of negligence. *See Lindquist*, 168 S.W.3d at 653. Considering the challenged language in the context of the rest of those paragraphs, we find the jury would not have been misdirected, misled, or confused by the term "fractures" in the way Plaintiff suggests because it was instructed to consider only the fractures suffered during the surgery, not the ones incurred after surgery. *See Huelskamp*, 475 S.W.3d at 173, 175-76 (viewing challenged language in light of the whole instruction); *see also SKMDV Holdings*, 494 S.W.3d at 553 (the party challenging an instruction has the burden to prove it misdirected, misled, or confused the jury). Accordingly, subsections (c) and (d) were not too general, vague, ambiguous, or indefinite. *See Huelskamp*, 475 S.W.3d at 173, 175-76; *Lindquist*, 168 S.W.3d at 653; *see also Coon*, 46 S.W.3d at 93.

Moreover, we find Instruction Four did not constitute a roving commission because the phrase "fractures which occurred during the April 16, 2014 surgery" was sufficiently explained through evidence presented at trial. *See Klotz*, 311 S.W.3d at 767; *Williams*, 114 S.W.3d at 370-72. *Inter alia*, Dr. McDonald's testimony and medical records support the conclusion that Plaintiff sustained multiple fractures during the April 16, 2014 surgery. First, Dr. McDonald testified the only time "all those bones are going to be broken in multiple places" would have been during the April 16, 2014 procedure. Dr. McDonald also found the x-rays taken right after

the April 16, 2014 surgery showed "complete destruction of the acetabulum, fractures of the medial wall, [and] fractures through the inferior pubic rami." Dr. McDonald concluded the fractures occurred during the surgery. While the parties and witnesses used the terms "fractures" and "fracture" interchangeably to describe what happened to Plaintiff's pelvis during the April 16, 2014 surgery, we are required by our standard of review to view the evidence in the light most favorable to submission of the instruction and disregard the evidence to the contrary. *See Huelskamp*, 475 S.W.3d at 173; *Fletcher*, 296 S.W.3d at 478.

Thus, because the phrase "fractures which occurred during the April 16, 2014 surgery" as used in Paragraph First subsections (c) and (d) of Instruction Four was sufficiently explained and thereby given meaning by the evidence presented at trial, we conclude the verdict director did not constitute a roving commission. *See Klotz*, 311 S.W.3d at 767 and *Williams*, 114 S.W.3d at 370-72 (similarly finding). The second part of Defendant's fourth point on appeal is denied.

**C.      Whether the Trial Court Erred in Limiting Cross-Examination**

In its fifth point on appeal, Defendant contends the court erred in sua sponte limiting its cross-examination of Plaintiff about evidence from his Facebook page and in denying its offer of proof on the subject. We disagree.

**1.      Standard of Review and General Law Relating to Defendant's Claim**

The admission or exclusion of evidence as well as the permissible scope and extent of cross-examination are matters that lie within the sound discretion of the trial court. *Moore v. Missouri Highway and Transportation Commission*, 527 S.W.3d 215, 220 (Mo. App. E.D. 2017); *Stephenson v. Countryside Townhomes, LLC*, 437 S.W.3d 380, 389 (Mo. App. E.D. 2014). We will not disturb the court's rulings as to these matters absent a clear abuse of discretion, and the appellant bears the burden of establishing such an abuse of discretion occurred. *Id*. An abuse of discretion occurs when a trial court's ruling is "clearly against the

32

logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Koelling*, 558 S.W.3d at 550 (quotations omitted).

Pursuant to our standard of review, this Court presumes the trial court's ruling is correct, as the court has discretion to weigh the probative value of evidence against its prejudicial effect. *Stephenson*, 437 S.W.3d at 389. Additionally, we review claims of evidentiary error for prejudice, not mere error, and thus, we will only reverse if we find the court's exclusion of evidence prejudiced appellant in that it materially affected the merits of the action so as to deprive appellant of a fair trial. *Peters v. ContiGroup*, 292 S.W.3d 380, 392-93 (Mo. App. W.D. 2009); *Byers v. Cheng*, 238 S.W.3d 717, 726 (Mo. App. E.D. 2007).

## 2. Relevant Facts and Procedural Posture

Prior to Plaintiff testifying at trial, Defendant AOS's counsel brought to the trial court's attention two printouts purportedly from Plaintiff's Facebook page, which were found while counsel was preparing to cross-examine Plaintiff. The Facebook posts, allegedly written by Plaintiff in April 2017 (five months prior to trial), indicated he had been accepted to undergo hip surgery in Germany and he would finally be able to walk again after the surgery was completed. Because information related to any future surgery had not been produced during discovery, Defendant's counsel requested a mistrial due to the fact they were not able to ask Plaintiff's expert about whether the future surgery affected her opinions as to Plaintiff's future condition and damages. No other relief was requested.

Plaintiff's counsel then explained Plaintiff, desperate to find a doctor to help him walk again, had been searching all over the United States and Europe trying to find such a doctor. Plaintiff allegedly made contact with a surgeon in Germany, but the surgeon had not examined or agreed to treat him. Plaintiff's counsel said he had not made any arrangements for Plaintiff to

33

undergo surgery in Germany. For these reasons and because he was not a retained expert, Plaintiff did not disclose the foregoing information to Defendant's counsel prior to or during the trial.

As part of the preceding discussion, the trial court expressed its opinion that evidence from a witness's Facebook page is "the worst hearsay that you can possibl[y] bring into any courtroom." Having heard the parties' arguments and one of the relevant Facebook posts, the trial court denied Defendant's request for a mistrial.

During Defendant's cross-examination of Plaintiff the following exchange occurred:

[Defendant's counsel]:    [ ]. Do you currently have plans to travel to Germany to undergo another hip surgery?

[Plaintiff]:    I am considering possibilities of it, yes.

[Defendant's counsel]:    Okay. Do you recall posting on your Facebook account traveling to Germany to have a surgery?

[Plaintiff]:    No, I don't remember that, but I could have.

The trial court then asked counsel to approach. During a discussion at the bench, the court said it would not allow Defendant's counsel to impeach Plaintiff with the Facebook evidence.

On subsequent re-direct examination, Plaintiff's counsel asked Plaintiff the following questions over Defendant's objections, which were overruled by the trial court:

[Plaintiff's counsel]:    [Plaintiff], do you right now have any plans or arrangements or connection with a surgeon in Germany or anybody else –
. . .

[Plaintiff's counsel]:    To address your right hip[?]
. . .

[Plaintiff]:    I am looking for somebody to help me because I have looked all over the [United] States.

[Plaintiff's counsel]:    That's all I asked of you. You're looking but you haven't found anybody yet?

34

| | |
|---|---|
| [Plaintiff]: | Yes. |
| [Plaintiff's counsel]: | You still have hope but no plans? |
| | . . . |
| [Plaintiff]: | Yes. |

Defendant's counsel did not inquire any further into this issue on re-cross examination.

Later, outside of the presence of the jury, Defendant made its offer of proof as follows in relevant part:

| | |
|---|---|
| [Defendant's counsel]: | [ ]. I'm going to hand you a document of a printout from what I believe is your Facebook page. Do you recognize your Facebook profile picture and name in that series of comments? |
| [Plaintiff]: | Yes. |
| [Defendant's counsel]: | Can I just ask you – sorry. Can I just ask you to read the comment that was made at – on April 18th at 12:35? |
| | . . . |
| [Plaintiff]: | Benny Bell, 'Believe it or not, I am waiting for this lawsuit to be over so I can go to Germany and have a hip transplant, so that is the story. I have been accepted already.' |
| [Defendant's counsel]: | And do you recall making that comment on Facebook? |
| [Plaintiff]: | Yes. |
| [Defendant's counsel]: | One more page to show you. The highlighted portion there, this comment is dated April 26th at 9:30. Could you just read that comment into this record? |
| [Plaintiff]: | 'It is still the hip. My lawyer's arranging right now for my sixth and last hip surgery. I will soon be walking. Yay.' |
| [Defendant's counsel]: | And do you recall making that comment? |
| [Plaintiff]: | No, I don't. |
| | . . . |

35

| | |
|---|---|
| [Defendant's counsel]: | The comment that you read first into the record that you recall making on April 18th, does that refresh your recollection as to whether you've had any conversations with a surgeon in Germany about another surgery? |
| [Plaintiff]: | What I've been doing is the same thing that I've been doing here in America, is trying to find someone to help me. And if you can see at the top there, there's Russian writing. And if you look at my email account, it's mostly European – it's more Europeans and Russian and so on than American. So I wasn't making a public cry, if you will, but I did ask for help privately, you know, to help me find someone because I was completely turned down here. Now, I – the Russian had asked to help me. We were inquired in Germany, and I was not accepted. |
| [Defendant's counsel]: | This comment here where you say you've been accepted already in Germany, were you accepted to a hip joint transplant in Germany? |
| [Plaintiff]: | No. Listen, the – in trying to get a place in Germany – the United States doesn't have a very good relationship at the moment, and so basically what the answer that I've been getting back is let the America[n]s take care of their own mess. |
| | . . . |
| [Defendant's counsel]: | Do you have any documentation in your possession, whether it's letters, emails, any other correspondence between you and any European medical provider regarding your attempts to arrange medical care for your right hip in Europe? |
| [Plaintiff]: | I have been corresponding with a Dr. Beckert that was looking for someone to – to do a pelvis revision on my hip. |
| | . . . |
| [Defendant's counsel]: | So if I'm understanding correctly, while you may have been communicating with some European medical providers, including Dr. Beckert, about potential surgery to repair your right hip, the statement that you've been accepted already is not true; is that your testimony? |
| [Plaintiff]: | It's – it was true, but then they turned me down. |

36

| [Defendant's counsel]: | So did you receive notification from somebody in Europe that you had been accepted for a particular surgery? |
|---|---|
| [Plaintiff]: | Well, no. They will not accept me because it's no way for – to give a diagnosis of what I have. |

After hearing Defendant's offer of proof, the trial court reaffirmed its prior ruling as to the Facebook evidence. In Defendant's motion for new trial, Defendant argued the court "erroneously refused to allow Defendant's counsel to present evidence of Plaintiff's Facebook posts regarding plans to undergo additional hip surgery." This motion was denied.

### 3. Defendant's Argument and Analysis

On appeal, Defendant argues the trial court erred in preventing Defendant's counsel from eliciting more information as to Plaintiff's alleged plans to undergo a future surgery in Germany. As to prejudice, Defendant asserts the topic was relevant to Plaintiff's claim for future medical and non-medical expenses, which were testified to by Plaintiff's expert life care planner, Nurse Klosterman. Because Nurse Klosterman's testimony was presented prior to Plaintiff's, the Facebook posts were not discovered prior to her testimony and Defendant did not address the matter during her cross-examination. Nurse Klosterman testified as to a cost projection for Plaintiff's future expenses based on the assumption there were no surgical options available to improve Plaintiff's condition, but according to Defendant, if Plaintiff were to undergo "a surgical procedure that allows him to ambulate without assistance and resolves even some of his complaints, the accommodations recommended by [Nurse] Klosterman [and included in her cost projection] would be unnecessary."

Initially, we emphasize that the trial court did not wholly prevent Defendant from inquiring into the subject of Plaintiff's plans to seek additional treatment in Europe or from asking about Plaintiff's alleged Facebook posts, which would have been erroneous. *See, e.g.,*

37

*Koelling*, 558 S.W.3d at 552 (the trial court may not "rule off limits an entire area of inquiry which has a bearing upon the witness's veracity"); *Merk v. St. Louis Public Service Co.*, 299 S.W.2d 446, 449 (Mo. 1957) and *Reno v. Wakeman*, 869 S.W.2d 219, 224 (Mo. App. S.D. 1993) (the court does not have discretion to entirely prohibit any cross-examination on a proper subject). Rather, the court allowed Defendant to ask the two questions and held Defendant to the answers elicited. The trial court also allowed Plaintiff's counsel to ask three questions on the topic of Plaintiff's search for a new surgeon. In limiting any further inquiry as to the Facebook posts themselves, the court reasonably exercised its discretion to exclude evidence it considered to be hearsay that was more prejudicial than probative. *See Stephenson*, 437 S.W.3d at 389; *see also Byers*, 238 S.W.3d at 726 (in reviewing the exclusion of evidence, we are concerned with whether the trial court abused its discretion, not whether the evidence was admissible). Upon reviewing the relevant portions of the record, we cannot say Defendant satisfied its burden to demonstrate the trial court clearly abused its discretion in so ruling. *See Moore*, 527 S.W.3d at 220; *Stephenson*, 437 S.W.3d at 389; *see also Koelling*, 558 S.W.3d at 550.

Additionally, we find Defendant has failed to establish sufficient prejudice that would require us to disturb the trial court's discretion in controlling the permissible scope and extent of cross-examination. *See ContiGroup*, 292 S.W.3d at 392-93; *Byers*, 238 S.W.3d at 726; *see also Moore*, 527 S.W.3d at 220; *Stephenson*, 437 S.W.3d at 389. As previously stated, Defendant's argument as to prejudice is that the future surgery would change cost projections related to Plaintiff's future medical and non-medical expenses. However, Plaintiff's testimony before the jury as well as the offer of proof both show that at the time of trial, there was no actual prospect of a future surgery.

Moreover, although Defendant's counsel did not have the specific Facebook evidence about Plaintiff's potential future surgery until they were preparing to cross-examine Plaintiff,

38

counsel certainly knew a hypothetical surgery would possibly be available to Plaintiff prior to their examination of Nurse Klosterman. Specifically, Dr. King testified a "salvage-type" of procedure could have been available to possibly improve the condition of Plaintiff's hip. Dr. King explained that in this extreme type of surgery, a pelvic reconstruction specialist would insert a new metal structural cage and attach it to remaining bone as an attempt to stabilize Plaintiff's hips. Even in light of Dr. King's testimony, which was presented prior to Nurse Klosterman's testimony, Defendant did not challenge the fact that Nurse Klosterman's findings and report were based on the assumption there were no surgical options available to improve Plaintiff's condition. Because Defendant had the opportunity to ask Nurse Klosterman about how a future surgery would affect her cost projections, Defendant's argument he was prejudiced by being deprived of this opportunity is without merit.

Based on the foregoing, we find the trial court's rulings relating to Defendant's cross-examination of Plaintiff did not prejudice Defendant by materially affecting the merits of the action or by depriving Defendant of a fair trial. *See ContiGroup*, 292 S.W.3d at 392-93; *Byers*, 238 S.W.3d at 726. Therefore, the court did not err in sua sponte limiting Defendant's cross-examination of Plaintiff about evidence from his Facebook page and in denying its offer of proof on the subject. Point five is denied.

**D.       Whether the Trial Court Erred Regarding Defendant's Requested Reduction**

In Defendant's sixth and final point on appeal, it alleges trial court error regarding its requested reduction under section 537.060. Specifically, Defendant argues the court erred in denying its post-trial motion to amend the judgment to account for a reduction because it properly pleaded the affirmative defense of statutory reduction and renewed its request throughout the trial. Where, as in this case, no factual disputes about the prior settlement payments were submitted to the jury and the trial court ruled on the issue as a matter of law, our

standard of review is de novo. *See J.J.'s Bar and Grill, Inc. v. Time Warner Cable Midwest, LLC*, 539 S.W.3d 849, 875 (Mo. App. W.D. 2017); *Gibson v. City of St. Louis*, 349 S.W.3d 460, 465 (Mo App. E.D. 2011).

Section 537.060 provides a judgment entered against a defendant may be reduced by the amounts recovered by a plaintiff pursuant to settlement agreements entered into between the plaintiff and joint tortfeasors. *Sanders v. Ahmed*, 364 S.W.3d 195, 211 (Mo. banc 2012). The plain language of the statute declares the defense of reduction under section 537.060 only applies between joint tortfeasors who are "liable in tort for the same injury." *Sanders*, 364 S.W.3d at 211-12 and *Stevenson v. Aquila Foreign Qualifications Corp.*, 326 S.W.3d 920, 925 (Mo. App. W.D. 2010) (quoting section 537.060) (emphasis omitted). "Joint and several liability occurs where the concurrent or successive negligent acts or omissions of two or more persons, although acting independently of each other, are, in combination, the direct and proximate cause of a single injury to a third person, and it is impossible to determine in what proportion each contributed to the injury." *Sanders*, 364 S.W.3d at 212 (quotations omitted). In other words, joint tortfeasors are two or more defendants whose alleged tortious conduct causes an indivisible injury to the plaintiff within the same transaction of facts. *Stevenson*, 326 S.W.3d at 925. An indivisible injury occurring in a single transaction of facts is readily distinguishable from instances in which one injury occurs and the negligence of an independent tortfeasor aggravates the initial injury. *Sanders*, 364 S.W.3d at 212.

Procedurally, Missouri Courts have found a mere claim by the plaintiff that multiple independent tortfeasors caused a plaintiff's injury is not sufficient to trigger the application of section 537.060 when the plaintiff settles with one of the independent tortfeasors. *Stevenson*, 326 S.W.3d at 928. In some instances, though, the plaintiff's pleadings and an ensuing settlement may give rise to a rebuttable presumption of joint liability for purposes of the

40

statutory reduction. *Sanders*, 364 S.W.3d at 213; *J.J.'s Bar and Grill*, 539 S.W.3d at 876. Once this presumption arises, the plaintiff must then show the injuries are divisible. *Id*. However, where the plaintiff's pleadings are not sufficient to establish joint liability, the burden of proving that element remains on the non-settling tortfeasor seeking the reduction. *See Sanders*, 326 S.W.3d at 212-13; *Stevenson*, 326 S.W.3d at 928-30.

In response to Plaintiff's petition asserting his six claims against the four original defendants,[14] Defendant AOS filed its answer and affirmative defenses alleging, *inter alia*, its right to a reduction under section 537.060 based on the fact Plaintiff had entered into confidential settlement agreements with Smith & Nephew and McDonald's. Defendant subsequently provided the trial court with the stipulated settlement amounts. After the jury returned its verdict in favor of Plaintiff, Defendant filed a motion to amend the judgment to account for a reduction. Plaintiff then filed a response asserting Defendant was not a joint tortfeasor with Smith & Nephew and McDonald's because there was no indivisible injury. Because Defendant's motion to amend was not ruled on by the court within ninety days, it was denied and deemed final for purposes of appeal. *See Poage*, 523 S.W.3d at 507; *see also* Missouri Supreme Court Rules 78.06 and 81.05(a)(2)(A) (2017).

Based on our review of the petition, we find the pleadings in this case were not sufficient to give rise to the rebuttable presumption of joint liability. *See Sanders*, 364 S.W.3d at 213; *J.J.'s Bar and Grill*, 539 S.W.3d at 876. While it would not have been sufficient in and of itself to satisfy Defendant's burden, we note Plaintiff did not plead that the four defendants were jointly and severally liable for his injuries. *See Stevenson*, 326 S.W.3d at 928. Instead, Plaintiff pleaded a separate count against Smith & Nephew and McDonald's, both of which included a

---

[14] As previously stated, Plaintiff asserted one claim of products liability against Smith & Nephew, one claim of premises liability against McDonald's, three claims of medical malpractice against Defendant AOS and the underlying defendant Dr. Redjal, and one claim of negligent supervision, retention, and referral against Defendant AOS.

prayer for relief independent of the claims brought against Defendant and Dr. Redjal. Further, the petition alleges multiple independent tortious acts that did not occur within the same transaction of facts. *See id.* at 926. Specifically, Plaintiff alleged facts showing the hip replacement components installed in his right hip on January 2, 2013 were defectively designed, manufactured, and sold by Smith & Nephew to support his products liability claim; Plaintiff set forth facts occurring on a trip to McDonald's on November 21, 2013 in which Plaintiff's crutch slipped on wet floor causing discomfort in his hips, low back, and pelvic area to support his premises liability claim; and Plaintiff alleged facts related to Defendant and Dr. Redjal's treatment and care of Plaintiff from August 2013 through November 2014 to support his remaining claims.

Notably, the petition includes allegations supporting the claims against the settling defendants (Smith & Nephew and McDonald's) that conflict with some of the allegations against Defendant so that a jury would not be able to find them jointly liable. *See id.* at 928 (finding that under the facts pled, the plaintiff would not have been able to secure a joint judgment against the co-defendants). For example, Plaintiff alleged in his claim against Smith & Nephew that he underwent a total right hip replacement surgery on or about January 2, 2013 in which Smith & Nephew components were implanted into his right hip. Plaintiff further alleged in this claim that Dr. Redjal performed the April 16, 2014 surgery because one or more of the Smith & Nephew hip replacement components were defective and unreasonably dangerous at the time they were sold and implanted into Plaintiff's hip in January 2013. In contrast, one of the allegations set forth against Defendant and Dr. Redjal was that they failed to act in accordance with the multiple x-rays of Plaintiff's hip performed prior to the April 16, 2014 surgery showing the Smith & Nephew hip replacement components were in good position and were not loose. As an additional example, the pain in Plaintiff's hip, low back, and pelvic area allegedly caused by

42

McDonald's negligence could have supported Dr. Redjal's decision to perform the April 16, 2014 surgery, a fact which would have hindered Plaintiff's case against Defendant and the doctor.

On appeal, Defendant solely relies on *Brown v. Kneibert Clinic*, a rare case in which this Court found two independent torts occurred in a single transaction of facts and caused an indivisible injury to the plaintiff. 871 S.W.2d 2, 2-4 (Mo. App. E.D. 1993); *see also Gibson*, 349 S.W.3d at 466 (similarly describing *Kneibert Clinic*). In *Kneibert Clinic*, a surgeon employed by the defendant medical clinic performed a procedure on the plaintiff during which a medical device broke causing two perforations in the plaintiff's intestine. *Kneibert Clinic*, 871 S.W.3d at 3. The surgeon subsequently repaired one perforation but failed to discover and repair the second, causing additional injury to the plaintiff. *Id*. The plaintiff subsequently filed one lawsuit alleging a products liability claim against the medical device manufacturer and a medical malpractice claim against the clinic. *Id*. After the plaintiff settled with the manufacturer, the clinic sought a reduction under section 537.060 and the trial court reduced the judgment accordingly. *Id*. We affirmed, holding that although the manufacturer and the clinic "performed two independent tortious acts, the result of both of these acts was one injury to the plaintiff, and plaintiff was only entitled to recover once for the injury resulting from both acts." *Gibson*, 349 S.W.3d at 466 (citing *Kneibert Clinic*, 871 S.W.2d at 3) (internal quotations omitted).

As subsequently clarified by Courts discussing this issue, *Kneibert Clinic* does not deviate from the general rule that the "same injury" for purposes of section 537.060 is an indivisible injury caused by a single transaction of facts. *See Gibson*, 349 S.W.3d at 467; *Stevenson*, 326 S.W.3d at 926. Rather, *Kneibert Clinic* did in fact involve a "same injury" because the separate tortious acts of the manufacturer and the clinic converged in the same transaction of facts to cause one indivisible injury – a perforated intestine. *See Kneibert Clinic*,

43

871 S.W.2d at 3; *see also Gibson*, 349 S.W.3d at 466; *Stevenson*, 326 S.W.3d at 926. For this reason, the two defendants were legally found to be joint tortfeasors. *See id.*

Here, unlike in *Kneibert Clinic*, one or both of the settling tortfeasors' independent acts of negligence may have caused Plaintiff an initial injury, but it was the medical malpractice of Defendant AOS and Dr. Redjal that caused Plaintiff's catastrophic injuries giving rise to this appeal. We find the case law supports the conclusion Defendant and Dr. Redjal's tortious conduct was an aggravation of Plaintiff's original injury. *See Gibson*, 349 S.W.3d at 466-67; *Stevenson*, 326 S.W.3d at 924-28; *see also Sanders*, 364 S.W.3d at 212.

> When separate torts result in both an original injury and an aggravation thereof, such as when a physician negligently treats the original injury, the successive tortfeasor, e.g., the physician, is not liable for the underlying injury and is only responsible for the harm flowing from his own negligence. An original tortfeasor may be liable for any additional damages resulting from the negligent treatment of an injury by a physician, but the physician, who has played no part in causing the original injury, will be liable only for the additional harm caused by his or her own negligence in treatment. An initial tortfeasor and a subsequently negligent physician act independently of each other; their several wrongs were committed at different times; and the tort of each, being several when committed did not become joint merely because its consequences united with the consequences of another.

*Gibson*, 349 S.W.3d at 467 (internal quotations and citations omitted). Simply put, Defendant and Dr. Redjal were not joint tortfeasors with Smith & Nephew and McDonald's. *See id*. at 464-68 and *Stevenson*, 326 S.W.3d at 924-28 (similarly finding); *see also Sanders*, 364 S.W.3d at 212 (joint and several liability is distinguishable from a case in which an injury occurs and a third party's negligent act aggravates the initial injury).

As the pleadings in this matter did not give rise to the rebuttable presumption of joint liability, Defendant had the burden to prove joint liability existed. *See Sanders*, 326 S.W.3d at 212-13; *Stevenson*, 326 S.W.3d at 928-30. For the foregoing reasons, we conclude Defendant has not and cannot satisfy its burden in this case. Accordingly, the trial court did not err in

denying Defendant's post-trial motion to amend the judgment to account for Defendant's requested reduction.  Point six is denied.

## III.   CONCLUSION

The trial court's judgment in favor of Plaintiff is affirmed.


_____
ROBERT M. CLAYTON III, Judge

Roy L. Richter, P.J., and
Angela T. Quigless, J., concur.